**25-1570**

# United States Court of Appeals for the Federal Circuit

RAVGEN, INC.,

*Plaintiff-Appellee,*

v.

LABORATORY CORPORATION OF AMERICA HOLDINGS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas
No. 6:20-cv-00969, Hon. Alan D. Albright

**NONCONFIDENTIAL RESPONSE BRIEF OF APPELLEE RAVGEN, INC.**

John M. Desmarais
Kerri-Ann Limbeek
Brian D. Matty
Frederick J. Ding
Raymond Habbaz
Gillian Moore
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400

October 31, 2025

**U.S. PATENT NO. 7,332,277**
CLAIM 132

55. A method comprising determining the sequence of a locus of interest on free fetal DNA isolated from a sample obtained from a pregnant female, wherein said sample comprises free fetal DNA and an agent that inhibits lysis of cells, if cells are present, wherein said agent is selected from the group consisting of membrane stabilizer, cross-linker, and cell lysis inhibitor.

59. The method of claim 55, wherein said agent is a cell lysis inhibitor.

60. The method of claim 59, wherein said cell lysis inhibitor is selected from the group consisting of: glutaraldehyde, derivatives of glutaraldehyde, formaldehyde, derivatives of formaldehyde, and formalin.

132. The method of claim 60, wherein said cell lysis inhibitor is selected from glutaraldehyde, formaldehyde and formalin.

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 26.1, 28(a)(1), and 47.4, counsel for appellee certifies the following:

1. The full name of every entity represented in this case by me is:

   Ravgen, Inc.

2. The name of every real party in interest, if that entity is not the real party in interest, is:

   N/A

3. All parent corporations and every publicly held corporation that owns 10 percent or more of the stock of the entity represented by me are:

   N/A

4. The names of all law firms, partners, and associates that have not entered an appearance in this appeal, and appeared for the entity in the trial court or are expected to appear for the entity in this court are:

   **Desmarais LLP:** Gabrielle E. Higgins, Jamie L. Kringstein, Benjamin N. Luehrs, Kyle G. Petrie, Joze Welsh, Deborah Mariottini, Jun Tong, Maria A. Tartakovsky, Peter Zhu, Vi T. Tran, Julianne M. Thomsen

   **Dacus Law Firm:** Deron R. Dacus, Savannah Carnes

5. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   Yes. *See* Dkt. No. 8 (Form 9A filed on Apr. 1, 2025)

6. Provide any information required under Fed. R. App. P. 26.1(b) and 26.1(c).

N/A

Dated: October 31, 2025

/s/ *Kerri-Ann Limbeek*

Kerri-Ann Limbeek
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400
Fax: (212) 351-3401
klimbeek@desmaraisllp.com

*Counsel for Appellee Ravgen, Inc.*

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................ ii

RELATED CASES ........................................................ xiv

JURISDICTIONAL STATEMENT ........................................................ xiv

INTRODUCTION ........................................................ 1

STATEMENT OF THE ISSUES ........................................................ 3

STATEMENT OF THE CASE ........................................................ 5

I. Technology and Factual Overview ........................................................ 5

- A. The Patented Discovery—Using Formaldehyde to Inhibit Maternal Cell Lysis then Sequencing Fetal DNA from Blood—Opened a New Era in Noninvasive Prenatal Testing. ........................................................ 5
- B. Labcorp Met with Dr. Dhallan and Tested His Approach, Which He Told Them Was Worth $300 Million in 2009. ................ 8
- C. The Infringing Tests Use Streck Tubes, Which Labcorp Knew Use Formaldehyde, then Sequence the Fetal cfDNA. ........................................................ 11
- D. Labcorp Had Licenses to a Less Valuable Patent. ........................ 13
- E. Labcorp's Infringing Tests Saw Commercial Success. ................ 15
- F. Labcorp Expected to Be Sued for Infringement. ........................ 15

II. Procedural History ........................................................ 16

- A. Pretrial Proceedings. ........................................................ 16
- B. The Jury Found Infringement, Willfulness, and Damages After a Thorough Five-Day Trial. ........................................................ 17
- C. Four Days After Trial Ended, Labcorp Tried to Resurrect Its Equitable Defense. ........................................................ 18

D. Post-Trial Rulings Left the Verdict Intact and Awarded 37% Enhancement. ....................19

SUMMARY OF THE ARGUMENT ....................21

STANDARDS OF REVIEW ....................23

ARGUMENT ....................25

I. The District Court Correctly Denied JMOL of Noninfringement....................25

A. Labcorp Infringes "Determining the Sequence of a Locus of Interest." ....................25

1. Labcorp Forfeited Its Claim Construction Argument that Claim 132 Requires Pre-Selecting a Locus Before Sequencing. ....................26

2. Construing the Terms Would Have Made No Difference and the Verdict Was Supported by Substantial Evidence. ....................27

B. Labcorp Infringes by Using Formaldehyde. ....................32

1. Substantial Evidence Supports Literal Infringement. ....................32

2. Specific Testimony and Admissions Support Infringement Under the Doctrine of Equivalents. ....................37

II. Labcorp Has No Basis to Disturb the Judgment of Validity....................39

A. 35 U.S.C. § 315(e)(2) Precludes a New Trial on Invalidity Based on Patents and Printed Publications. ....................39

B. There Is No Live Controversy over Unasserted Claims. ....................43

C. The District Court Correctly Precluded Labcorp's Experts from Testifying About Priority Issues They Did Not Analyze in Their Reports. Without That Testimony, Labcorp Could Not Carry Its Clear-and-Convincing Burden of Proof. ....................44

III. This Court Should Not Remand on Equitable Estoppel. ....................48

A. The District Court Did Not Abuse Its Discretion in Finding Labcorp's Defense Waived....48

B. Labcorp's Defense Was Not Meritorious....51

IV. This Court Should Affirm the Damages Award Based on Reliable Expert Testimony and Factual Evidence....53

A. The Jury Awarded Damages Based on Reliable Expert Testimony and a New Trial on Damages Is Not Warranted....53

1. The District Court Did Not Abuse Its Discretion by Admitting Meyer's Testimony About the Ravgen Agreements....54

2. The District Court Did Not Abuse Its Discretion by Admitting Meyer's Testimony About the Sequenom Agreements....62

3. Meyer Apportioned to the Claimed Invention....66

B. The Court Did Not Abuse Its Discretion by Excluding Prowse's Improper Analysis that Treated the Streck Tube—Which Cannot Be "Patent-Practicing"—as the SSPPU....69

V. The Well-Supported Willfulness Verdict and Enhancement Order Should Stand....72

A. The District Court Correctly Denied JMOL of No Willful Infringement....72

1. Substantial Evidence Supports the Verdict....72

2. Ravgen Did Not Violate Section 298....74

3. The District Court Did Not Abuse Its Discretion on Evidentiary Rulings of Hearsay....77

B. The Court Properly Exercised Discretion in Enhancing Ravgen's Damages by 37% Based on Facts Found by the Jury and the *Read* Factors....79

CONCLUSION....80

CERTIFICATE OF COMPLIANCE ..................................................................
CERTIFICATE OF CONFIDENTIAL MATERIAL ........................................
CERTIFICATE OF SERVICE ........................................................................

**Confidential Information Omitted**

The material omitted on pages 15, 53, 56-58 are rates and financial amounts from Ravgen's agreements with third parties, which information is subject to third-party confidentiality obligations and governed by the protective order, Appx(i)-(xv).

The material omitted on pages 32-33 are quantities of the formula in Streck's tubes. Although the identities of the chemicals are not confidential, *see* Appx25531-25532(853:12-854:25); Labcorp Br. 7, Streck has indicated that it views the formula as confidential and governed by the protective order.

The material omitted on pages 2, 14 are royalty rates in Sequenom's licenses with third parties ISIS and Mayo Foundation, which Labcorp has indicated is confidential and governed by the protective order.*

* The 2014 Sequenom-Quest license (Appx38284-38303(PTX-1130)) is not confidential because it was filed with the SEC, where confidential treatment expired in 2017 and Ravgen's counsel obtained a copy by FOIA request. Labcorp withdrew its request to seal PTX-1130 below.

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) (en banc)....................................................51

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ...................................................................34

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) ...................................................................68

*AstraZeneca Pharms. LP v. Apotex Corp.*,
669 F.3d 1370 (Fed. Cir. 2012) ...................................................................43

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
512 F.3d 1338 (Fed. Cir. 2008) ...................................................................28

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
967 F.3d 1353 (Fed. Cir. 2020) ..............................................................61, 62

*Catalina Lighting, Inc. v. Lamps Plus, Inc.*,
295 F.3d 1277 (Fed. Cir. 2002) ...................................................................34

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,
942 F.3d 1119 (Fed. Cir. 2019) ...................................................................24

*Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015) ...................................................................67

*Core Wireless Licensing S.A.R.L. v. Apple Inc.*,
899 F.3d 1356 (Fed. Cir. 2018) ...................................................................49

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015) ...................................................................45

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018) .....................................................................45

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) (en banc) .......................................55, 56, 57

*Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*,
927 F.3d 1292 (Fed. Cir. 2019) ...............................................................56, 66

*eSpeed, Inc. v. Brokertec USA, L.L.C.*,
417 F.Supp.2d 580 (D. Del. 2006) ..............................................................49

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*,
879 F.3d 1332 (Fed. Cir. 2018) ...............................................................68, 69

*Fractus, S.A. v. Samsung Elecs. Co.*,
876 F.Supp.2d 802 (E.D. Tex. 2012) ..........................................................50

*Freshub, Inc. v. Amazon.com, Inc.*,
No. 6:21-cv-00511-ADA, D.I. 242 & 244
(W.D. Tex. June 22, 2021) .........................................................................48

*Georgetown Rail Equip. Co. v. Holland L.P.*,
867 F.3d 1229 (Fed. Cir. 2017) .................................................................74

*Gomez v. St. Jude Med. Daig Div. Inc.*,
442 F.3d 919 (5th Cir. 2006).......................................................23, 34, 35, 73

*Graphon Corp. v. Classified Ventures, LLC*,
No. 2:08-cv-00097-TJW,
2009 WL 900754 (E.D. Tex. Mar. 30, 2009) .............................................49

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016).........................................................................24, 72, 79

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
780 F.3d 1357 (Fed. Cir. 2015) (Taranto, J., concurring)...........................77

*Hologic, Inc. v. Minerva Surgical, Inc.*,
957 F.3d 1256 (Fed. Cir. 2020) .................................................................61

*Ingenico Inc. v. IOENGINE, LLC*,
136 F.4th 1354 (Fed. Cir. 2025) .................................................................40

*Innogenetics, N.V. v. Abbott Labs.*,
512 F.3d 1363 (Fed. Cir. 2008) ....................................................................31

*Interactive Gift Express, Inc. v. Compuserve Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ....................................................................29

*Kaufman v. Microsoft Corp.*,
34 F.4th 1360 (Fed. Cir. 2022)...........................................................25, 26, 52

*Kinetic Concepts, Inc. v. Blue Sky Med. Grp.*,
554 F.3d 1010 (Fed. Cir. 2009) ....................................................................28

*In re Lab. Corp. of Am. Holdings*,
No. 22-127, 2022 WL 1498775 (Fed. Cir. May 12, 2022)..............................xiv

*Lab. Corp. of Am. Holdings v. Ravgen, Inc. (Labcorp IPR Appeal)*,
Nos. 23-1342, 23-1345,
2025 WL 32904 (Fed. Cir. Jan. 6, 2025) ............................................xiv, 7, 39

*Lab. Corp. of Am. Holdings v. Ravgen, Inc.*,
No. 23-1517, 2025 WL 324749 (Fed. Cir. Jan. 29, 2025)..............................59

*Medtronic Inc. v. Intermedics, Inc.*,
799 F.2d 734 (Fed. Cir. 1986) ......................................................................70

*Meyers v. Asics Corp.*,
974 F.2d 1304 (Fed. Cir. 1992) ....................................................................51

*Microsoft Corp. v. i4i L.P.*,
564 U.S. 91 (2011)..........................................................................................44

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
10 F.4th 1358 (Fed. Cir. 2021).......................................................................59

*Novartis Pharms. Corp. v. Par Pharm. Inc.*,
2019 WL 9343055 (D. Del. Apr. 11, 2019).....................................................40

*Olaplex, Inc. v. L'Oréal USA, Inc.*,
855 F.App'x 701 (Fed. Cir. 2021) .......................................................39, 41, 42

*Omega Patents, LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021).......................................................................61

*Optis Wireless Tech., LLC v. Huawei Device USA, Inc.*,
421 F.Supp.3d 410 (E.D. Tex. 2019) ....................................................49

*Ortho Pharm. Corp. v. Smith*,
959 F.2d 936 (Fed. Cir. 1992) ....................................................37

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) ....................................................27

*Packet Intel. LLC v. NetScout Sys., Inc.*,
100 F.4th 1378 (Fed. Cir. 2024) ....................................................43

*Packet Intel. LLC v. NetScout Sys., Inc.*,
No. 2:16-cv-00230-JRG, 2018 WL 4286193
(E.D. Tex. Sept. 7, 2018) ....................................................49

*Pavo Sols. LLC v. Kingston Tech. Co.*,
35 F.4th 1367 (Fed. Cir. 2022) ....................................................67, 68, 70

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
849 F.3d 1360 (Fed. Cir. 2017) ....................................................56

*Provisur Techs., Inc. v. Weber, Inc.*,
119 F.4th 948 (Fed. Cir. 2024) ....................................................74

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ....................................................61

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
580 U.S. 328 (2017) ....................................................51

*Shows v. Jamison Bedding, Inc.*,
671 F.2d 927 (5th Cir. 1982) ....................................................76

*Smith v. Travelers Cas. Ins. Co. of Am.*,
932 F.3d 302 (5th Cir. 2019) ....................................................24

*Sobansky v. Ravgen, Inc.*,
2023 WL 7924855 (D. Neb. Nov. 16, 2023) ....................................................10, 36

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
14 F.4th 1323 (Fed. Cir. 2021) ....................................................72, 79, 80

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985) (en banc)........................................................30

*SSL Servs., LLC v. Citrix Sys., Inc.*,
769 F.3d 1073 (Fed. Cir. 2014) ........................................................................23

*Streck, Inc. v. Ravgen, Inc.*,
No. 23-1989, 2025 WL 262102 (Fed. Cir. Jan. 22, 2025)....................xiv, 7, 39

*Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*,
665 F.3d 1269 (Fed. Cir. 2012) ........................................................................43

*Tech. Licensing Corp. v. Videotek, Inc.*,
545 F.3d 1316 (Fed. Cir. 2008) ...................................................................45, 46

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ........................................................................30

*Vectura Ltd. v. Glaxosmithkline LLC*,
981 F.3d 1030 (Fed. Cir. 2020) ...................................................................66, 67

*ViaTech Techs. Inc. v. Microsoft Corp.*,
733 F.App'x 542 (Fed. Cir. 2018)......................................................................38

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ...................................................................53, 62

*Vocalife LLC v. Amazon.com, Inc.*,
534 F.Supp.3d 698 (E.D. Tex. 2021) ................................................................49

*Vulcan Eng'g Co. v. Fata Aluminium, Inc.*,
278 F.3d 1366 (Fed. Cir. 2002) ........................................................................31

*Wi-LAN, Inc. v. Apple Inc.*,
811 F.3d 455 (Fed. Cir. 2016) ...............................................................23, 72, 73

*Williams v. Manitowoc Cranes, L.L.C.*,
898 F.3d 607 (5th Cir. 2018).......................................................................24, 74

*XY, LLC v. Trans Ova Genetics*,
890 F.3d 1282 (Fed. Cir. 2018) ........................................................................42

**Statutes**

28 U.S.C. § 2111 .......................................................................................27

35 U.S.C. § 103 .......................................................................................39

35 U.S.C. § 112 .......................................................................................46

35 U.S.C. § 298 ....................................................................................*passim*

35 U.S.C. § 315(e)(2) ............................................................................*passim*

35 U.S.C. § 325(e)(2) ..................................................................................41

**Other Authorities**

Fed. Cir. R. 28(b) ....................................................................................xiv

Fed. R. Civ. P. 42(b) ............................................................................48, 49

H.R. Rep. No. 112-98 (2011) ..................................................................42, 76

U.S. Patent No. 7,332,277, Appx144-424 ...............................................*passim*

All emphasis added unless otherwise noted.

## RELATED CASES

This Court decided two appeals concerning *inter partes* reviews (IPRs) of Claim 132 of U.S. Patent No. 7,332,277 in *Laboratory Corp. of America Holdings v. Ravgen, Inc.*, Nos. 23-1342, 23-1345, 2025 WL 32904 (Fed. Cir. Jan. 6, 2025) [hereinafter *Labcorp IPR Appeal*] (LOURIE, BRYSON, STARK); and *Streck, Inc. v. Ravgen, Inc.*, No. 23-1989, 2025 WL 262102 (Fed. Cir. Jan. 22, 2025) (LOURIE, BRYSON, STARK). Labcorp also petitioned for mandamus to transfer the case below. *In re Lab. Corp. of Am. Holdings*, No. 22-127, 2022 WL 1498775 (Fed. Cir. May 12, 2022) (DYK, REYNA, CHEN) (denying petition).

The following pending case also involves the ’277 Patent and may be affected by this appeal: *Ravgen, Inc. v. Natera, Inc.*, No. 1:20-cv-00692-ADA (W.D. Tex.).

## JURISDICTIONAL STATEMENT

Omitted pursuant to Fed. Cir. R. 28(b).

## INTRODUCTION

The jury reached a well-supported verdict of infringement, willfulness, and damages based on damning evidence that Labcorp elides. Labcorp's omnibus approach of appealing every ruling and finding that it lost does not show that the district court was biased or repeatedly erred, but rather signals Labcorp's desperate attempt to find *any* way to avoid accountability after getting caught.

This trial presented overwhelming evidence of a breakthrough invention that Labcorp used with full knowledge that it was infringing. The scientific community praised Dr. Ravinder Dhallan's solution of using formaldehyde to inhibit maternal cell lysis, which enabled noninvasive prenatal testing (NIPT) using fetal cell-free DNA that circulates in maternal blood. Labcorp knew of the invention's value because Labcorp asked for "exclusive rights" to Ravgen's patents, listing them by patent number in a 2012 letter. Labcorp had tested the invention and found it to work as reported. And documents proved that Labcorp knew the Streck tubes used a chemical called IDU that released formaldehyde, that in turn cross-linked proteins in the cell membrane to inhibit cell lysis. Labcorp still uses those Streck tubes to preserve blood samples so they can be shipped, then performs sequencing of the fetal DNA,

using selected regions of the DNA to assess for chromosomal abnormalities. Labcorp just did not want to pay the $300 million that Dr. Dhallan sought for a partnership.

Ultimately, after Labcorp sold $1.5 billion of the infringing NIPTs, the jury awarded $272.5 million, based on a $100/test royalty rate that fit: (1) Ravgen's own license agreements for the patent-in-suit, (2) Labcorp's in-license, and out-licenses at $60-[redacted]/test, for a less valuable patent, and (3) the $300 million that Dr. Dhallan told Labcorp his invention was worth, back in 2009. The district court's exercise of discretion to enhance damages by 37% for Labcorp's willfulness was well supported, too. None of Labcorp's last-ditch arguments warrant overturning the judgment.

This Court should affirm.

## STATEMENT OF THE ISSUES

1. *Infringement*—

   a. Whether Labcorp forfeited its claim construction argument that Claim 132 requires pre-selecting a locus before "determining the sequence of a locus of interest";

   b. Whether substantial evidence supports literal infringement and JMOL was correctly denied;

   c. Whether substantial evidence supports infringement under the doctrine of equivalents.

2. *Validity*—

   a. Whether Labcorp is estopped after affirmance of two final written decisions involving Labcorp's IPRs, precluding any remand for a new trial on obviousness based on patents and printed publications;

   b. Where the final judgment pertains only to Claim 132, whether there is a live case-or-controversy regarding unasserted claims dropped before trial;

   c. Whether the district court correctly held that Labcorp could not meet its burden to show that certain references are prior art.

3. Whether Labcorp waived its equitable estoppel defense.

4. *Damages*—

   a. Whether the district court abused its discretion in admitting Ravgen's damages analyses based on both sides' license agreements;

   b. Whether the district court abused its discretion to exclude Labcorp's expert's assertion that a Streck tube (which cannot practice the patent by itself) is the smallest saleable patent-practicing unit (SSPPU);

   c. Whether the district court correctly denied JMOL and a new trial.

5. *Willfulness and enhancement*—

   a. Whether substantial evidence supports the jury's finding that Labcorp intended to infringe;

   b. Whether a new trial must be granted where Ravgen showed willfulness based on evidence about nonlawyers demonstrating knowledge of infringement, and whether any alleged error regarding § 298 was so prejudicial as to warrant a new trial;

   c. Whether discretion permitted the award of 37% enhanced damages.

## STATEMENT OF THE CASE

### I. TECHNOLOGY AND FACTUAL OVERVIEW

Labcorp's recitation of facts (Br. 6-10) omits virtually everything the jury heard at trial. Labcorp's lopsided version ignores the actual invention, its value, and the overwhelming evidence of Labcorp's bad-faith conduct.

#### A. The Patented Discovery—Using Formaldehyde to Inhibit Maternal Cell Lysis then Sequencing Fetal DNA from Blood—Opened a New Era in Noninvasive Prenatal Testing.

Dr. Ravinder Dhallan, the named inventor of the '277 Patent and Ravgen's founder, is a medical doctor who began researching prenatal testing around 2000. Appx24761-24764, Appx24769; Appx29401-29402(demonstrative). At the time, amniocentesis—collecting cells from a fetus using a needle—was the only reliable way to test for genetic abnormalities during pregnancy, though it was invasive and led to miscarriages. Appx24764; Appx24941, Appx24943-24947(265:21-269:17), Appx24955-24956(277:9-278:7).

When Dennis Lo discovered that fetal DNA exists in a mother's blood a few years earlier, the conventional wisdom was that a very low percentage (~3-6%) of the cell-free DNA (cfDNA) in her blood was fetal—the rest was maternal—and thus fetal cfDNA was too scarce for sequencing. Appx24774-24775; Appx37115-37120; Appx38589; Appx38098; Appx25006-25007;

Appx29404(demonstrative). Noninvasive prenatal tests (NIPTs) that used fetal cfDNA in blood did not exist. Appx24955.

Dr. Dhallan in 2001 realized that the ***true*** amount of fetal cfDNA is actually higher, but the bursting—"lysis"—of maternal cells releases maternal DNA, diluting the fetal cfDNA. Appx24775-24777; Appx38241 (lab notebook); Appx29405-29408(demonstrative). Lysis irreversibly occurs during blood draw and shipment, when tubes filled with blood are subjected to stress. Appx24777-24778; Appx25092(414:1-17).

His solution was to use a chemical like formaldehyde to inhibit maternal cell lysis, preserving the fetal cfDNA so it can be sequenced. *See* Appx38241(PTX-0957); Appx37115. Ravgen's experiments showed that formaldehyde "substantially increased the percentage fetal DNA by decreasing the amount of mother's [DNA] released." Appx24783-24785; Appx29409(demonstrative).

Ravgen published its findings in the *Journal of the American Medical Association* (*JAMA*) in 2004. Appx37115-37120. Ravgen's second paper in *The Lancet* showed the recovered fetal cfDNA after formaldehyde preservation could be sequenced to identify trisomy 13 and trisomy 21. Appx37121-37128. Those papers sent shockwaves across the industry.

Appx24798-24800(120:3-122:9). Leading peer-reviewed journals ran editorials to laud the invention's "major clinical implications" for "a new era in prenatal diagnosis." Appx38097-38098; Appx37233-37235; Appx25004-25006. Popular media caught on to the potential for a noninvasive prenatal test. Appx37228-37230; Appx38336; Appx29414. Initial skepticism turned into acceptance. Appx25007-25008.

The '277 Patent, issued in 2008 (Appx145), protects Ravgen's novel use of formaldehyde to preserve a sample of maternal blood so the fetal cfDNA could then be sequenced. Appx24997-24998. Claim 132, the sole asserted claim (Appx1), is reproduced on the inside cover.

Claim 132 is unquestionably novel and nonobvious. During the proceedings below, Labcorp petitioned for two IPRs against the '277 Patent, and Streck also challenged Claim 132 in IPR. The PTAB upheld all challenged claims in three Final Written Decisions (FWDs), which this Court affirmed. *Labcorp IPR Appeal*, 2025 WL 32904; *Streck*, 2025 WL 262102.

The practical impact of the patented invention was enormous. A noninvasive draw of blood was now enough to get enough fetal cfDNA for testing. Appx24956-24957(278:9-279:25). Formaldehyde preservation allowed samples to be shipped to a central laboratory, over days, for sequencing—as

Labcorp does (*see* Appx38445-38446). Appx24958-24959; Appx25231-25232; Appx25128-25130. That made it commercially viable to offer an NIPT based on maternal blood. *See id.*; Appx24957(279:15-25).

An obstetrician-gynecologist testified: "It changed the way we practice medicine, obstetrics." Appx24941.

### B. Labcorp Met with Dr. Dhallan and Tested His Approach, Which He Told Them Was Worth $300 Million in 2009.

Looking for a partner to commercialize his invention, Dr. Dhallan approached Labcorp and met with scientists at Genzyme, which Labcorp acquired in 2010. Appx24805; Appx24810-24811; Appx38329; Appx25421; Appx25658(980:4-15).

Two Labcorp scientists knew Ravgen's inventions well: Kellie Watson and Tom Scholl. Appx24813; Appx25599; Appx38440(PTX-1500); Appx38329(PTX-1266). Dr. Watson "knew about the Ravgen patents because Dr. Dhallan told me about them." Appx25658(980:12-15). Dr. Scholl, a nonlawyer, had personally reviewed Ravgen's patents, and warned fellow scientists that he "was surprised by the breadth of the claims in the patents." Appx38323; Appx25605. They emailed each other, and Dr. Dhallan, about Ravgen's patents. Appx24818-24819 (discussing Appx38331); Appx25604-25605.

In 2009, Dr. Dhallan had a phone call with Dr. Watson. She recounted that he "really want[ed] a partner that is the MOST committed to seeing this through." Appx38646; Appx25647-25649. He told Dr. Watson that $300 million was his ballpark valuation to work with Labcorp to commercialize Ravgen's invention. Appx25647(969:4-25), Appx25649(971:3-14); Appx38645-38646. Behind his back, Labcorp employees disparaged him, calling him a "nutcase" with a "swelled head." Appx38320-38321. But Dr. Scholl, who had read Ravgen's patent, knew its value. He told colleagues, "it sounded to me that he places a very high value on the IP." Appx25604-25605(926:16-927:1).

Meanwhile, Labcorp was testing formaldehyde. Appx25653-25654. Though formaldehyde "didn't increase the ***absolute*** amount of fetal DNA"—the hook for Labcorp's revisionist argument that Ravgen's invention "didn't work" at all (Br. 64-65)—Labcorp's results confirmed that formaldehyde ***did*** increase the ***proportion*** of fetal DNA by suppressing the maternal background, by 44 percent in some instances. Appx25656-25657.

This set the stage for Dr. Scholl's confessions when he met Dr. Dhallan in person. *See* Appx38332-38333. Before Labcorp developed its own NIPT, Labcorp had a deal to distribute Ariosa's (now Roche). Appx24821-24823, Appx24908-24909; Appx38444. Ariosa used Streck Cell-Free DNA Blood

Collection Tubes ("Streck tubes"). *See* Appx25010; *Sobansky v. Ravgen, Inc.*, 2023 WL 7924855, at *1 n.1, *4 (D. Neb. Nov. 16, 2023). Streck tubes use imidazolidinyl urea (IDU), which is a "***formaldehyde releaser preservative***" that inhibits cell lysis. Appx37451-37466(PTX-0749) at Appx37458([0014]-[0015]); Appx37466 (Claim 20). IDU breaks down to formaldehyde both before and after blood is collected into the tube. Appx25681(1003:2-23); Appx25100. As discussed below at pp. 34-35, the way Streck tubes work is by formaldehyde cross-linking. Dr. Scholl revealed to Dr. Dhallan that Labcorp knew, by distributing Ariosa's test, Labcorp would be "infringing my patents."[2] Appx24823-24824(145:24-146:21).

Nevertheless, in 2014, Labcorp launched its informaSeq NIPT using Streck tubes. Appx25402(724:10-14); Appx25426-25427(748:21-749:14); Appx25429-25430(751:21-752:2). informaSeq and the MaterniT tests discussed below infringe Claim 132, as shown by the evidence discussed in Section I.A-B of the Argument. *Infra* pp. 25-38.

[2] Ravgen separately filed suit against Ariosa in 2020 and settled that suit.

### C. The Infringing Tests Use Streck Tubes, Which Labcorp Knew Use Formaldehyde, then Sequence the Fetal cfDNA.

Labcorp has another subsidiary, Sequenom, that developed the infringing MaterniT tests. Appx24825; Appx25422. MaterniT21 assesses for trisomy 21 (Down Syndrome), and MaterniT GENOME assesses for additional abnormalities.[3] Appx25448(770:5-21). Both use a tube of maternal blood. Appx36938. After the blood sample arrives at Labcorp, cfDNA is extracted. Appx36939; Appx38009. The cfDNA fragments from the sample are hybridized to an array and amplified. Appx36943-36945. Labcorp uses sequencing machines to identify 27 base pairs on each fragment. Appx36945-36946; Appx25546(768:6-12). Then, Labcorp maps those sequence reads to a reference genome to identify the location on the genome of each read, filters out repeated sequences, and specifically identifies the loci that are on chromosomes of interest (i.e., 21, 18, or 13). Appx36946; Appx25070-25077.

When Sequenom first launched MaterniT in 2011, it tried to commercialize MaterniT with prior-art EDTA tubes, Appx37146. Appx25230-25231(552:4-553:9). But Sequenom was bleeding money on that test. Appx25231-25233(553:15-555:1); Appx24126(demonstrative). EDTA tubes did

[3] Labcorp's other infringing NIPT, informaSeq, was discontinued and worked essentially the same as MaterniT. Appx25385-25386(707:17-708:3).

not inhibit lysis, so Sequenom had to rush each sample on ice by carrier so it could be "processed into plasma within 6 hours of blood draw," "ideally, within 1 hour"—a costly endeavor. Appx37146; Appx37129-37130; Appx25230-25232; Appx24124-24125(demonstrative). Most doctors' offices could not process samples onsite. Appx24957(279:15-25).

Sequenom needed a way to avoid lysis so that samples could be shipped to a central laboratory. By 2012, it switched to Streck tubes. Appx25321(643:2-8). Sequenom had done validation studies that showed that Streck tubes inhibit cell lysis and stabilize cfDNA for days. Appx37137(PTX-0255), Appx37146-37149. Sequenom scientists discovered that the additive in Streck tubes caused "***cross-linking*** that helps to stabilize the white cells," i.e., maternal cells, "preventing lysis." Appx37328(PTX-0719), Appx37333; Appx25555(877:6-15).

Sequenom scientists found a Streck patent application that cites Dr. Dhallan for the use of formaldehyde. *See* Appx37188; Appx37451-37466(PTX-0749) at Appx37457([0008]). They copied quotations from Streck's patent application into their internal report, observing that Streck uses a "formaldehyde donor," and added the fact: "Formaldehyde induces DNA-protein or protein-protein ***cross linking***…." Appx37188. "Cross-linking"

proteins in the cell membrane is how formaldehyde works to inhibit lysis. Appx25182(504:1-24); Appx25111-25112.

That's why Sequenom's then-CEO, Harry Hixson, met with and wrote to Dr. Dhallan about Ravgen's patents right around the time Sequenom was switching to Streck tubes. Appx24829-24830; Appx37095(PTX-0234). Hixson told Dr. Dhallan that Sequenom "had done an in-house study of the formaldehyde" and knew "how great it worked." Appx24830(152:9-13). He asked for "an exclusive license to [Ravgen's] two patents (IP)," proposing that Sequenom "would pay Ravgen an annual royalty… ***for the use of the Ravgen IP***." Appx38335(PTX-1301). Hixson reiterated that request in a letter, expressing "interest[] in acquiring ***exclusive rights to your issued patents – 7,332,277***, 7,442,506, and 7,727,720." Appx37095(PTX-0234). Unfortunately, Dr. Dhallan had just been hospitalized for a life-threatening illness and was out of commission for years. Appx24832-24833; Appx24930. No business deal was reached. *Id.* Sequenom kept infringing anyway, and Labcorp acquired Sequenom in 2016. Appx25192(514:15-24), Appx25618-25619(940:21-941:9).

### D. Labcorp Had Licenses to a Less Valuable Patent.

Sequenom had an exclusive license with ISIS to Dennis Lo's '540 patent. Appx25134-24135(456:1-457:13); Appx25249-25251(571:9-573:1); Appx37096-

37114(PTX-0236) at Appx37112. Sequenom agreed to a royalty rate of [redacted], later doubled to [redacted], based on net sales of NIPT tests. Appx25250-25251(572:8-573:1); Appx37112; Appx38279-38283(PTX-1106) at Appx38281. That ’540 patent was considerably narrower than Dr. Dhallan’s breakthrough invention, as its method only worked for ***male fetuses*** because it depended on the Y sex chromosome that distinguishes male cfDNA from the maternal cfDNA. Appx24135-24136(457:18-458:25); Appx25251-25252(573:11-574:11); *see also* Appx24943(265:1-10).

Sequenom then licensed out the ’540 patent to Quest and the Mayo Foundation. Appx25197-25198(519:20-520:13), Appx25203(525:14-17), Appx25254(576:8-17); Appx38284-38303(PTX-1130); Appx37225-37227(PTX-335); Appx36918-36935(PTX-145). Sequenom charged Quest $60 per unit for a license, where no rights were granted other than patent rights. Appx25198-25200(520:1-522:1), Appx25202(524:13-17). Sequenom charged Mayo [redacted] per unit. Appx25254-25255(577:7-578:23). Sequenom’s licensing representative testified that the company prefers per-unit royalties. Appx25202-25203(524:18-525:1).



(1) ISIS royalty rate
(2) amended ISIS royalty rate
(3) Sequenom-Mayo royalty rate

### E. Labcorp's Infringing Tests Saw Commercial Success.

By 2021, Labcorp was selling more than 500,000 infringing tests every year. Appx25233-25234(555:4-556:8). The average selling price (ASP) for the infringing tests is about $475, yielding over $1.5 billion in revenue through trial. Appx25280(602:21-24); Appx25919(1241:6-9). In total, Labcorp sold 2,724,974 infringing units during the damages period from October 2014 through 2022. Appx25265-25267(587:23-589:11); Appx24150-24151(demonstrative).

### F. Labcorp Expected to Be Sued for Infringement.

Between 2020 and 2022, other industry participants that used Streck tubes in cfDNA tests took licenses from Ravgen for the '277 Patent and '720 Patent (which also relates to the use of formaldehyde to inhibit cell lysis, *infra* pp. 59-61). Appx25930(1252:5-13); Appx10129; Appx10452; Appx10432; Appx10848. Each accepted a royalty structure that applied a (1) [redacted] rate to U.S. sales of cfDNA kits, minus applicable discounts. Appx24842-24846(164:24-168:4); *e.g.*, Appx10133, Appx10456, Appx24601. Ravgen filed complaints against NIPT companies that, like Labcorp, were infringing by using Streck tubes then sequencing the fetal cfDNA, including Natera and PerkinElmer. PerkinElmer settled in June 2021, paying (2) [redacted] of its U.S. sales of cfDNA kits

(1) starting royalty rate
(2) net royalty rate

for a license to both Ravgen patents. Appx10435; Appx25936-25937(1258:10-1259:2). Another jury later found Natera to infringe too. Br. 11.

When they found out that Ravgen sued Natera in 2020, the Labcorp scientists who had met Dr. Dhallan reacted with: "Oh… my.. god…." Appx38327. Another pondered: "I was wondering when this would happen." Appx38325. Those were the same scientists who knew that "most laboratories that perform NIPT use Streck tubes," like Labcorp does. Appx25010.

As the jury inferred, Labcorp saw this lawsuit coming.

## II. PROCEDURAL HISTORY

Ravgen sued Labcorp in the Western District of Texas. Appx470.

### A. Pretrial Proceedings.

At the pretrial conference, the court resolved several pending motions, including motions for summary judgment, *Daubert* issues, and motions *in limine*. Appx46-50. The court memorialized those orders in opinions issued shortly after trial concluded. Appx51-65; Appx66-73; Appx74-82.

Ravgen moved *in limine* to exclude equitable estoppel arguments because Labcorp had failed to provide discovery. Appx23304-23305. Labcorp stated only that "we're not going to ask the jury to determine equitable estoppel. That's for your Court -- Your Honor to decide"—yet ***did not move***

***to bifurcate*** for a separate trial on equitable estoppel, and never asked about the court's bench trial procedures. Appx23305. The court ruled that presuit correspondence could be presented to the jury. Appx23306(105:5-11).

### B. The Jury Found Infringement, Willfulness, and Damages After a Thorough Five-Day Trial.

The evidence discussed above was presented to the jury via testimony of Dr. Dhallan, Dr. Eddleman (an OB-GYN), Ravgen's chemistry and genetics expert Dr. Van Ness (Appx24974-24975(296:2-297:25)), Ravgen's damages expert Paul Meyer, and a volume of underlying exhibits. After Dr. Van Ness analyzed the licensed patents in the Ravgen agreements and in Labcorp's agreements and opined on their relative value, Appx25135-Appx25138(457:5-460:12), Meyer arrived at a royalty rate of $100/test that accounts for Labcorp's preferred per-unit form of royalty and Ravgen's licensing structure for the '277 Patent. Appx25262-25265(584:10-587:22); Appx24149(demonstrative). At $100/test on Labcorp's NIPTs priced at $475, damages were $272,497,400. Appx25247-25248(569:25-570:4); Appx25267(589:1-20); Appx24151-24152(demonstrative).

Several Labcorp employees (including Dr. Watson) testified, though Dr. Scholl did not. The jury heard the testimony of a Streck scientist by

deposition, and Streck's CEO came to testify voluntarily for Labcorp, though she conceded key issues on cross-examination.

The district court enforced its pretrial order that precluded Labcorp's experts from opining on the patent-in-suit's priority date because they failed to analyze that issue in their expert reports. Appx75-79. On day 3 of trial, Labcorp withdrew all invalidity defenses and agreed to a jury instruction reflecting that. Appx25816-25817(1138:14-1139:2); Appx25992-25993(1314:25-1315:2).

The jury returned a unanimous verdict finding Claim 132 infringed; finding that infringement willful; and awarding $272,497,400.00 in compensatory damages, the exact amount Mr. Meyer testified to. Appx23385-23390.

### C. Four Days After Trial Ended, Labcorp Tried to Resurrect Its Equitable Defense.

Throughout trial, Labcorp never once mentioned equitable estoppel, nor tried to present testimony outside the jury's presence for its affirmative defense. Appx96-97, Appx100. When the jury was sent to deliberate—when concurrent bench trials normally take place, *infra* Argument § III.A—Labcorp still said nothing. Appx26068-26069; Appx100-101, Appx103.

Once the jury was excused, the Court checked whether anything remained outstanding: "Anything that we need to take up on behalf of the plaintiff? … Anything for the defense?" Appx26072. Labcorp said: "None, Your Honor." *Id.* Trial ended on Friday, September 23, 2022. Appx26073.

Four days later, after being found a willful infringer, Labcorp suddenly tried to resurrect the affirmative defense it had not raised throughout trial. While Ravgen was seeking guidance on entry of judgment pursuant to Rule 58, Labcorp interjected that there is a "pending non-jury issue" of equitable estoppel and asked "how the Court would like to proceed." Appx27799-27800. The court found Labcorp had waived its defense and entered judgment, beginning the post-trial phase. Appx23412-23413. Labcorp conceded below that Labcorp had not "ask[ed] [the Court] during the course of the trial to do anything about the equitable estoppel issue." Appx96.

### D. Post-Trial Rulings Left the Verdict Intact and Awarded 37% Enhancement.

Based on the verdict of willful infringement and a reasoned exercise of discretion, the district court conservatively awarded 37% enhancement ($100 million added to the jury-found damages of $272,497,000). Appx107-117.

The court declined to disturb the jury's findings of infringement and damages. Appx125-134; 2025 WL 285011 (W.D. Tex. Jan. 23, 2025). It also denied a new trial. Appx135-143; 2025 WL 572753 (W.D. Tex. Feb. 12, 2025).

Finally, the court awarded supplemental damages through patent expiration, and interest. Appx118-123; 2025 WL 284643 (W.D. Tex. Jan. 23, 2025). Labcorp does not independently challenge those rulings.

## SUMMARY OF THE ARGUMENT

This was a clear-cut case of infringement. Labcorp's new claim construction argument about pre-selecting a particular locus before sequencing is forfeited because it never asked for that as a construction before or at trial. Substantial evidence shows infringement: Labcorp both performs "determining the sequencing of a locus of interest" and uses formaldehyde to inhibit cell lysis. Labcorp's arguments to the contrary ignore the record and ask this Court to draw different scientific and factual conclusions, but this Court may not substitute its view of the facts for the jury's.

On validity, this Court does not need to reach the merits of Labcorp's appeal. Labcorp is a doubly-estopped IPR petitioner, whose now-affirmed FWDs triggered IPR estoppel under 35 U.S.C. § 315(e)(2). Having presented only patents and printed publications at trial, Labcorp may not receive a new trial on alleged obviousness based on those references. And there is no Article III live controversy regarding unasserted claims, for the grant of summary judgment regarding ACD.

On equitable estoppel, Labcorp's trial counsel waived this defense. Labcorp never moved to bifurcate to a separate trial date for bench issues, so this district court, like others across the country, conducted a single

concurrent trial on all issues. The court permitted Labcorp to introduce evidence of presuit interactions at the jury trial, yet Labcorp never tried to present its equitable estoppel defense. Once trial concluded, it was too late to raise it.

On damages, Labcorp's appeal stretches its credibility by making assertions that contradict the record. Ravgen's experts properly accounted for the differences between the Ravgen agreements, the Sequenom agreements, and the hypothetical negotiation at issue—including unchallenged testimony of Dr. Van Ness on the technical value of the licensed patents. The resulting analysis was adequately apportioned to the value of the patented invention, and the jury's resulting verdict is supported by substantial evidence. The law does not require using the infringer's costs as the baseline for damages, and moreover, Ravgen's invention is not limited to the value of the Streck tube.

The willfulness verdict was supported by substantial evidence, which Labcorp ignores in favor of its own preferred inferences. Nothing Ravgen did violated Section 298, because the willfulness case was based not on refusal to waive privilege over attorney analyses, but rather on probative evidence of what Labcorp's scientists said and did. And the district court did not err in

excluding Labcorp's purportedly exculpatory "testing evidence," about which the jury nonetheless received lengthy testimony. The resulting enhancement was based on the jury-found facts of culpable conduct warranting punishment.

Therefore, the judgment should be affirmed.

## STANDARDS OF REVIEW

The Fifth Circuit reverses a denial of JMOL "only if, when viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion." *Wi-LAN, Inc. v. Apple Inc.*, 811 F.3d 455, 461 (Fed. Cir. 2016) (quoting *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)). The reviewing court must "draw all reasonable inferences in favor of the nonmoving party" and "may not weigh the evidence or the credibility of the witnesses." *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 937-38 (5th Cir. 2006).

The denial of a new trial is reviewed for abuse of discretion, but "[t]here is no such abuse of discretion unless there is a complete absence of evidence to support the verdict." *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1082 (Fed. Cir. 2014) (citation omitted).

The district court's admission or exclusion of evidence, and findings of waiver, are also reviewed for abuse of discretion. *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018); *Smith v. Travelers Cas. Ins. Co. of Am.*, 932 F.3d 302, 308 (5th Cir. 2019); *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1132 (Fed. Cir. 2019).

There is "no precise rule or formula" for enhanced damages, which is reviewed for abuse of discretion. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103, 106 (2016).

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY DENIED JMOL OF NONINFRINGEMENT.

Labcorp's grab-bag of reinvented and new arguments on appeal that it never raised in the district court do not warrant disturbing the verdict, which is amply supported by substantial evidence. This Court should affirm.

### A. Labcorp Infringes "Determining the Sequence of a Locus of Interest."

Labcorp conjures a claim construction argument in Section I.A.1 of its brief, but Labcorp's quarrel has nothing to do with the meaning of "locus of interest" or "sequence" in Claim 55 (on which Claim 132 depends). Rather, Labcorp contends that Claim 132 requires ***pre-selecting*** a region to be sequenced, before the recited step of "determining the sequence of a locus of interest"—what Labcorp labels "*targeted* sequencing." Br. 24-26. Labcorp never once raised that claim construction issue to the district court until after trial and therefore forfeited it. *See Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1370-71 (Fed. Cir. 2022). And if the district court had construed "locus of interest" or "sequence," that would not have mattered because there was substantial evidence of infringement even under those constructions.

### 1. Labcorp Forfeited Its Claim Construction Argument that Claim 132 Requires Pre-Selecting a Locus Before Sequencing.

At trial, Labcorp argued that "massively parallel shotgun sequencing" (MPSS) does not infringe, as a factual issue for the jury. Appx24742, Appx24747 (opening); Appx25444-25446; Appx26052 (closing). At the charge conference, Labcorp objected *only* to the construction of "if cells are present" in Instruction No. 14 (Appx23364-23365). Appx25824(1146:3-9). Labcorp did not ask to construe "determining the sequence of a locus of interest" as requiring pre-selection of the locus before sequencing, nor otherwise object for failing to construe "sequence" or "locus of interest." *See id.*; *Kaufman*, 34 F.4th at 1370 ("Nor does Microsoft point to anything it said in the charging conference that raised the issue.").

Like Microsoft, Labcorp did not raise its pre-selection argument before trial either. It said nothing at *Markman* about "locus of interest" or pre-selecting the locus. *See* Appx5853 (TOC of Labcorp's *Markman* brief). Nor at summary judgment. Appx7192-7193 (TOC of SJ brief). Nor in its proposed jury instructions. Appx21578-21579.

Labcorp's only response to forfeiture is a footnote that it had incorporated earlier arguments from another defendant, PerkinElmer. Br. 24

n.1 (citing Appx5876 & n.7). (Arguments in footnotes are waived too. *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012).) But PerkinElmer did not make Labcorp's "targeted sequencing" argument. Instead, PerkinElmer argued that "determining…" requires "ascertaining" "the identity of at least one nucleotide at a specific location"—saying nothing about targeted versus random sequencing or *when* selection must occur. Appx39648-39651; Appx39851. Therefore, Labcorp's wholesale incorporation of PerkinElmer's brief (Appx5876) was not enough to preserve the pre-selection issue.

Having chosen to argue noninfringement as a fact issue rather than as a construction, Labcorp forfeited its construction, so this Court need not go further. The district court correctly denied JMOL on this basis. Appx127-129.

#### 2. Construing the Terms Would Have Made No Difference and the Verdict Was Supported by Substantial Evidence.

Labcorp fails to show that it would have mattered had the district court given "locus of interest" and "sequence" the cited definitions (Br. 23). *See* 28 U.S.C. § 2111.

*First*, the jury heard the patent's definitions of both "locus of interest" and "sequence," which Ravgen's expert applied. Appx25067(389:14-25); Appx25064-25065(386:12-387:7).[4] That the district court did not reiterate those definitions was harmless. *Kinetic Concepts, Inc. v. Blue Sky Med. Grp.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009).

*Second*, because Claim 132 is a "comprising" claim, it does not require sequencing just one region—one may sequence thousands or millions of loci at once. Appx25068-25069(390:8-391:5); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-43 (Fed. Cir. 2008). "Locus *of interest*" is still given effect because one may sequence many regions in parallel, then determine which loci are "of interest" by selecting those regions for analysis. Appx25070-25072.

When Labcorp performs sequencing, it determines ***where*** in the genome the sequenced fragments come from, by "mapping" them to their "origin/position"; then Labcorp counts the reads at the loci of interest on the chromosome(s) being assessed for trisomy. Appx38597-38599(DTX-0312). Dr. Van Ness explained that DNA fragments align "with a unique position";

[4] "Sequence" is irrelevant because Labcorp indisputably identifies the nucleotides that are "the first 27 bases" of each DNA fragment. Appx25446(768:1-12); Appx25066-25067.

Labcorp needs to use loci that are on a particular selected chromosome and discard sequences that do not map. Appx25070 (explaining PTX-0176), Appx25072-25077; Appx36936(PTX-0176), Appx36946-36947. That is how MaterniT assesses whether Chromosome 21, 18, or 13 is over-represented, showing trisomy: "a slightly larger contribution of sequence reads ***mapping to***" that chromosome. Appx25076-25077; Appx36961-36963. Dr. Van Ness concluded that the claim step is satisfied. Appx25077(399:4-16).

*Third*, the patent's statement that "locus of interest" refers to a "selected region of nucleic acid that is within a larger region" means that the desired region is a ***subset***, not all of an organism's DNA, but it imposes no size constraint on the region. Appx200(29:6-7). Certainly it does not mean that Claim 132 requires first "selecting a region" before sequencing—a step Claim 132 does not recite in its method. *Cf. Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). Where the '277 Patent wants to specifically claim targeted sequencing, it says so by claiming a step of using primers or restriction enzymes to pick a locus before determining its sequence, *e.g.*, Claims 70-71, or by reciting the sequencing technique, *e.g.*, Claim 49. Claims 55 and 132 do not state those limitations and are not so

limited. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985) (en banc).

Indeed, the specification shows that Claims 55 and 132 cover any form of sequencing. Appx203(36:5-23). Under a heading with the same words as the recited step, the specification states: "***Any*** method that provides information on the sequence of a nucleic acid can be used including but not limited to…" some thirty examples, including simply "DNA sequencing." *Id.*; Appx24923-24924(245:12-246:19); Appx188(6:26-34) ("determining the sequence includes… hybridization," "sequencing," "DNA microarray"). Such a long, sweeping list shows an intention to be broad rather than limiting. Labcorp tries to flip the long list of examples around, contending that all examples are of "*targeted* sequencing" and therefore the claim requires targeted sequencing. Br. 26. Labcorp identifies no record evidence that all examples are "of *targeted* sequencing," *id.*—and Labcorp's expert conceded that MPSS is nevertheless "DNA sequencing," one of the examples. Appx25858-25859(1180:23-1181:2). Besides, Labcorp's argument is contrary to law. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation.").

Labcorp's argument that the specification has "no examples" of "shotgun" sequencing and "MPSS did not exist then" (Br. 26) is meritless. A patentee need not exemplify every infringing embodiment, and this Court has held that "later-arising" genetic sequencing techniques can infringe earlier patent claims "drafted broadly enough." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371-72 (Fed. Cir. 2008) ("Essentially, Abbott argues that a patent can never be literally infringed by embodiments that did not exist at the time of filing. Our case law allows for after-arising technology to be captured…."). That is the case here, where Claim 132 broadly covers any technique including "DNA sequencing." And MPSS uses hybridization and microarray techniques that are in the specification. Appx188(6:26-34); *see* Appx38596-38597. The *Quake* and *Stanford* cases about other patents' patentability (Br. 28) are likewise irrelevant. *See Vulcan Eng'g Co. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1376 (Fed. Cir. 2002) ("[S]ubsequent improvements do not in themselves preclude a finding of infringement." (citation omitted)).

Based on this record evidence, the jury could reasonably conclude that Labcorp determines the sequence from "selected regions of nucleic acid."

Therefore, JMOL was correctly denied.

### B. Labcorp Infringes by Using Formaldehyde.

This was not a hard case for the jury on formaldehyde: the whole point of putting [redacted] IDU in the Streck tube (Appx37536(PTX-0766)) was so that it could act as a "formaldehyde releaser preservative agent" upon contact with water or blood. Appx37451-37466(PTX-0749)[5] at Appx37458([0014]-[0015]); Appx37466 (Claim 20). IDU constantly replenishes the chemical equilibrium with more formaldehyde as the formaldehyde is used up. Appx25961-25962; Appx25111-25112. Literal infringement was supported by substantial evidence, but the jury also had ample testimony to support infringement under the doctrine of equivalents (DOE).

#### 1. Substantial Evidence Supports Literal Infringement.

Labcorp's noninfringement arguments (Br. 29-33) are strawmen, and the jury saw right through them. Ravgen did not go on a hunt for "trace amounts of formaldehyde" (Br. 30). Sworn FDA statements, unchallenged expert testimony, and admissions that Labcorp ignores on appeal established that IDU releases formaldehyde that inhibits cell lysis in the Streck tubes.

The Streck tube includes EDTA; IDU (aka Germall 115), the formaldehyde releaser; glycine; and water. Appx25095; Appx37497,

[5] PTX-0749 is Streck's 2010 patent application for the Streck tube. Appx25518-25519(840:3-841:8).



(1) concentration amount

Appx37537, Appx37540; Appx25568. There is “(1) [redacted]” as much IDU as glycine. Appx25095-25097; Appx37540. Streck’s scientist admitted that IDU breaks down to formaldehyde before and after blood is added. Appx25681(1003:2-23). Independent third-party publications confirmed that formaldehyde is in Streck tubes, both in the additive itself before plasma is added and after plasma is added to the tube:




Appx37602-37611(PTX-0785) at Appx37605; Appx37612(PTX-0789), Appx37621.

Labcorp misdirects by excerpting Dr. Van Ness’s testimony to suggest that IDU ***itself***, rather than formaldehyde, inhibits cell lysis. Br. 30. But Dr. Van Ness testified that IDU works by way of formaldehyde:



(1) relative amount of chemicals

> IDU which releases formaldehyde—reacts with free primary and secondary amine groups… ***the IDU-released formaldehyde is reacting with proteins.***… literally ***the formaldehyde is causing*** a bond connection between the proteins in the cell membrane.

Appx25111-25112(433:7-434:15). Formaldehyde "cross-links" the cell membrane to inhibit cell lysis. *Id.* Dr. Van Ness concluded that Labcorp infringes Claim 132 based on that mechanism. Appx25122-25124. And though two inputs to Dr. Van Ness's analysis were the Streck 510(k) and Sequenom feasibility report (Br. 30-32), the jury was permitted to credit his understanding, and the JMOL standard does not permit Labcorp to argue alternative inferences from the documents (Br. 31). *See Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1284 (Fed. Cir. 2002) ("[W]e must consider the record evidence in the light most favorable to the non-movant and draw all reasonable inferences in its favor" on review of JMOL.); *Gomez*, 442 F.3d at 937. Labcorp never moved to challenge Dr. Van Ness's chemistry expertise or his literal infringement analysis under *Daubert*, Appx7223-7224, so that testimony is substantial evidence. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1321 (Fed. Cir. 2012). Labcorp's sole, nonprecedential case, Br. 31 (citing *Dominion Energy, Inc. v. Alstom Grid LLC*, 725 F.App'x 980, 986 (Fed. Cir. 2018) (nonprecedential)), does not

require a contrary result, as the expert there "did not cite any particular documents" at all. *Id.* at 986.

Substantial evidence apart from Dr. Van Ness also showed infringement. Streck's CEO attended trial. Appx25511; Appx25561. The jury saw her impeachment by her prior testimony that Streck's idea was to use a "***formaldehyde releaser rather than formaldehyde directly***." Appx25521-25522. Moreover, Streck swore to the FDA that "***cross-linking*** is the mechanism for stabilizing the cell membrane" in the Streck tube, just as Labcorp scientists had understood when they identified "[f]ormaldehyde cross links" in a paragraph about Streck tubes. Appx25544-25545(866:22-867:5); Appx37188(PTX-0255); Appx37328 ("the cross-linking that helps to stabilize the white cells in the Streck tube"). Labcorp's expert had no data to refute Streck's FDA statements that cross-linking was the way Streck tubes work, conceded that formaldehyde works by cross-linking, and could identify ***no other cross-linker in the tube besides formaldehyde***. Appx25801-25803(1123:21-1125:18). This was more than sufficient to deny JMOL.

Labcorp's trace amounts arguments (Br. 30-32) are all irrelevant and ask this Court to re-weigh the evidence, which it may not do. *Gomez*, 442 F.3d at 937-38. The jury credited Dr. Van Ness's explanation that measurements

of "***free*** formaldehyde" were not informative, because formaldehyde that has already cross-linked is not counted. Appx25185-25186; Appx25961-25963(1283:19-1285:10). Labcorp's arguments about glycine "quenching" free formaldehyde (Br. 31) are similarly misleading because glycine quenches only "***some***" of the free formaldehyde. Appx25095-25096 (discussing Appx37536); Appx25163-25164(485:23-486:9). Labcorp's expert agreed that as formaldehyde reacts with glycine and with proteins on a cell membrane, "that causes the release of ***more formaldehyde from IDU*** to maintain the equilibrium." Appx25800-25801(1122:18-1123:8). IDU serves as "the formaldehyde donor that's providing the formaldehyde continuously as it's being used." Appx25961-25962; Appx25184-25185. And despite the inclusion of glycine, multiple third-party studies concluded there is formaldehyde in Streck tubes. Appx25795-25798(1117:20-1120:6); Appx37605; Appx37621.

Labcorp is correct that "the entire diagnostic-testing industry"—not just Labcorp—"uses Streck's tubes." Br. 7; Appx25010(332:7-25); *Sobansky*, 2023 WL 7924855, at *1 & n.1, *4. As the above facts show, that is no accident. The use of formaldehyde is necessary to how Streck tubes inhibit cell lysis. It is no defense that others infringe too.

Substantial evidence supports literal infringement, and JMOL was correctly denied.

### 2. Specific Testimony and Admissions Support Infringement Under the Doctrine of Equivalents.

This Court need not reach DOE as it should affirm on literal infringement, but there was also substantial evidence of equivalence in two ways. Labcorp focuses on an isolated question and answer of Dr. Van Ness (Br. 34), ignoring other particularized testimony and linking argument in the record.

*First*, the use of a delayed-release compound that breaks down to formaldehyde, Appx25095-25096(417:18-418:4), and inhibiting cell lysis that way, Appx37457-37458([0006]-[0015]), is equivalent to adding formaldehyde as a reagent. This is exactly like how pro-drugs that break down inside a patient to become the active form, can infringe claims on the active drug under DOE. *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 939 & n.4 (Fed. Cir. 1992) (explaining pro-drugs).

*Second*, Labcorp's expert conceded that the function-way-result test is satisfied. He admitted that "the way that formaldehyde inhibits cell lysis is" to stabilize cells "by cross-linking amine groups in the cell membrane." Appx25802-25803(1124:17-1125:9). He also admitted that IDU stabilizes cell

membranes "by cross-linking with amine groups in the cell membrane." Appx25801-25802(1123:13-1124:10); Appx29427(demonstrative). And as Streck swore to the FDA, IDU functions to "prevent[s] cell lysis/breakage" to resolve the problem of "contamination with additional DNA from lysed cells," Appx37537, just like how formaldehyde in the claimed invention inhibits lysis with the same results, Appx37115. Accordingly, the IDU in a Streck tube performs the same function as formaldehyde (inhibiting cell lysis) in the same way (cross-linking amine groups in the cell membrane) to achieve the same result (suppressing maternal DNA release from cells). Appx25801-25803.

Labcorp's reliance on *ViaTech Technologies Inc. v. Microsoft Corp.*, 733 F.App'x 542 (Fed. Cir. 2018) (nonprecedential), is misplaced. Br. 34. *ViaTech* was a forfeiture case at summary judgment, where DOE was only mentioned in a footnote as a reservation of rights but not argued. 733 F.App'x at 552-53. That has no relevance here.

This Court should affirm on literal infringement, or alternatively, under DOE.

## II. LABCORP HAS NO BASIS TO DISTURB THE JUDGMENT OF VALIDITY.

Labcorp had two IPRs challenging the '277 Patent that were decided in FWDs two months after the jury trial, and subsequently affirmed in January 2025.[6] *Labcorp IPR Appeal*, 2025 WL 32904. IPR estoppel under 35 U.S.C. § 315(e)(2) is dispositive of all invalidity issues. Labcorp's only invalidity theories at trial were obviousness combinations based on patents and printed publications. Appx21593 (identifying Granger, Lee, Lo 1999, Landes, and Ryan as Labcorp's references).[7] And Labcorp dropped all invalidity defenses mid-trial, agreeing to a jury instruction that "***Labcorp is no longer disputing*** that the asserted claim ***is valid***." Appx25816-25817(1138:14-1139:2); Appx25992-25993(1314:25-1315:2). Even if this Court were to reach the issues, Labcorp shows no prejudicial error warranting a new trial.

### A. 35 U.S.C. § 315(e)(2) Precludes a New Trial on Invalidity Based on Patents and Printed Publications.

This Court should not go any further than reaffirming that IPR estoppel bars a petitioner from maintaining § 103 arguments based on patents and printed publications after an affirmed FWD. *See Olaplex, Inc. v. L'Oréal*

---

[6] This Court affirmed another FWD confirming Claim 132 in an IPR initiated by Streck. *Streck*, 2025 WL 262102. An indemnity agreement exists between Sequenom and Streck, supporting privity. *See* Appx25510-25511.
[7] Labcorp had no anticipation theory for Claim 132. Appx21595-21596.

*USA, Inc.*, 855 F.App'x 701, 714 (Fed. Cir. 2021) (nonprecedential) (applying estoppel from post-grant review (PGR) FWD that had been affirmed while appeal from district court on invalidity issues was pending); *Novartis Pharms. Corp. v. Par Pharm. Inc.*, 2019 WL 9343055, at *3 (D. Del. Apr. 11, 2019) (applying IPR estoppel post-trial).

The AIA gave Labcorp a choice between a jury and an expert tribunal at the PTAB for resolving patentability disputes—with the consequence that if it pursued an IPR that reached a FWD, Labcorp would be estopped from asserting "grounds" in a civil action that it could reasonably have raised in IPR. 35 U.S.C. § 315(e)(2); *Ingenico Inc. v. IOENGINE, LLC*, 136 F.4th 1354, 1365-66 (Fed. Cir. 2025) (estopped "grounds" are §§ 102 and 103 arguments based on patents and printed publications). Labcorp preferred that the PTAB decide patentability and filed several stipulations below to improve the chances of institution. Appx5035-5037 ("Labcorp seeks to avoid duplicative efforts and multiple proceedings addressing the same questions…. Rather, ***Labcorp wishes to have the PTAB exclusively address the patentability*** of the '277 patent on the above-identified grounds and primary references…."); Appx5042-5044. Now Labcorp seeks a do-over on patents and printed publications in court—but the law does not permit it.

In *Olaplex*, a PGR occurred in parallel with a jury trial; the PGR reached a FWD before trial and became appealable after trial, while post-trial motions remained pending in the district court. 855 F.App'x at 713. This Court affirmed the FWD while the district court appeal was pending, and the patentee asserted estoppel under 35 U.S.C. § 325(e)(2)[8] based on that affirmance. *Id.* Analogizing to the pre-AIA *inter partes* reexamination statute, this Court concluded that once it affirmed the FWD, statutory estoppel barred L'Oréal's obviousness appeal. *Id.* at 715 ("[E]stoppel rights arose when all appellate rights [in the PTAB proceedings] were exhausted.") (citing *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 642-48 (Fed. Cir. 2011)). Though L'Oréal raised different references in the two forums, this Court refused to create "an exception to the [estoppel] provision" because it could not do so "without severely weakening the evident function of the provision by generally allowing challengers, having lost on certain prior-art combinations before the Board, to press others in court." *Id.* This Court refused to address the merits of L'Oréal's invalidity appeal, regardless of the district court's alleged errors. *See id.*

[8] The IPR estoppel provision, § 315(e)(2), is "materially identical" to the PGR provision, § 325(e)(2). *Olaplex*, 855 F.App'x at 714.

The Court should do the same here. The present litigation differs slightly from *Olaplex* in that Labcorp's FWDs issued two months after the jury trial—but in both cases, the FWDs occurred before resolution of post-trial motions and entry of final judgment. Appx28079; Appx28141; Appx3. And like *Olaplex*, this Court affirmed Labcorp's FWDs before the present appeal. This Court's ***affirmance*** made those FWDs final, triggering estoppel. 855 F.App'x at 714. Any remand to the district court on validity—which could only be for trial on estopped "grounds" based on patents and printed publications because Labcorp raised no system art, Appx21593—would allow Labcorp to "assert… in a civil action… that the claim is invalid on [a] ground that [Labcorp] raised or reasonably could have raised" in IPR, contravening Congress's clear statutory command. *See* § 315(e)(2); H.R. Rep. No. 112-98, at 48 (2011) (noting that repeat attacks frustrate the purpose of providing cost effective alternatives to litigation).

Labcorp tries to diminish *Olaplex* because it was nonprecedential (Br. 38 n.2). But *Olaplex*'s reasoning, based on the precedential *Bettcher* case, fits with the body of law regarding the effect of an affirmance of an IPR on parallel district court litigation. *See, e.g.*, *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294 (Fed. Cir. 2018) (applying collateral estoppel upon affirmance of

FWD invalidating claims and therefore "not address[ing] Trans Ova's invalidity arguments"); *Packet Intel. LLC v. NetScout Sys., Inc.*, 100 F.4th 1378, 1386 (Fed. Cir. 2024). Here, this Court should hold that IPR estoppel applies during a district court appeal, where this Court has already affirmed the same defendant's IPR FWDs about the same patent.[9]

The district court did not rule on estoppel because its rulings regarding priority were correct, addressed below in Section II.C. Appx137-138; Br. 38 n.2. But this Court should affirm on the IPR estoppel basis, which (1) is supported by the record, (2) avoids the "futile exercise" of any remand, and (3) best implements congressional intent. *See AstraZeneca Pharms. LP v. Apotex Corp.*, 669 F.3d 1370, 1377 (Fed. Cir. 2012). There is thus no reason to address Labcorp's request for a new trial on invalidity (Br. 35-38).

### B. There Is No Live Controversy over Unasserted Claims.

Labcorp's anticipation argument (Br. 35) is moot because it mattered only to unasserted claims that Ravgen long ago dropped. *See Streck, Inc. v. Rsch. & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1282-84 (Fed. Cir. 2012).

---

[9] IPR estoppel is not an "equity" standard that permits this Court to carve out exceptions where Labcorp alleges error in the district court proceedings (Br. 38 n.2). Section 315(e)(2) is obviously statutory.

"Claim 132 [is] the sole claim asserted," and the final judgment concerned only Claim 132. Br. 9, 15; Appx23387-23390; Appx1. The ACD issue (Br. 35) related only to independent claims 55 and 81, which recite three categories of agents ("cell lysis inhibitors," "membrane stabilizers," and "cross-linkers"). Labcorp argued below that ACD anticipated the "membrane stabilizer" category. *See* Appx10904; Appx14830 at Appx14837, Appx14840.

But Claim 132 narrows the claimed agents to three "cell lysis inhibitors": glutaraldehyde, formaldehyde, and formalin. Appx424; Br. 9. ACD is irrelevant to Claim 132. Accordingly, this issue is moot, and this Court need not address it.

### C. The District Court Correctly Precluded Labcorp's Experts from Testifying About Priority Issues They Did Not Analyze in Their Reports. Without That Testimony, Labcorp Could Not Carry Its Clear-and-Convincing Burden of Proof.

Before trial, the district court precluded Labcorp's experts from testifying at trial regarding priority because they failed to analyze that issue in their reports. Appx75-79. Tellingly, ***Labcorp does not challenge*** that ruling. Br. 35-38. But without any evidence it could put on to establish that Landes was prior art, Labcorp could not meet its ultimate burden of proof no matter what happened the rest of trial. *See Microsoft Corp. v. i4i L.P.*, 564 U.S. 91, 95 (2011).

Labcorp's argument relies on the incorrect premise that Ravgen bore the burden of "proof" and that the district court effectively granted JMOL for the burden-bearing party (Br. 37). Entitlement to an earlier priority date is a burden-shifting framework where the burden of ***production*** can shift to the patentee, but the ultimate burden to prove invalidity always rests on the challenger and never shifts to the patentee. *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327-29 (Fed. Cir. 2008). A patentee bears only a burden of ***production***—<u>**not**</u> a burden of proof. *Id.* at 1328-29. Any contrary reading after *i4i* cannot be correct. Labcorp's other cited case, *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375 (Fed. Cir. 2015), involved the burden of proof in IPR when a ***petitioner*** argues that a prior-art ***reference*** is entitled to the date of ***its*** provisional before the challenged patent's priority date. *Id.* at 1377-80; *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1007 (Fed. Cir. 2018) (explaining *Dynamic Drinkware*). Neither case held—nor has this Court ever held after *i4i*—that a patentee bears a burden of proof on priority in district court.

Ravgen had already met its burden of production when the dispute over Landes arose mid-trial. Ravgen put on ***unchallenged***, <u>***un-cross-examined***</u> testimony from Dr. Van Ness mapping each element of Claim 132 to

provisional applications, giving pincites to paragraphs for the claim elements. Appx25017-25019; Appx25048-25053(370:20-375:15).[10] Dr. Van Ness also showed the jury a demonstrative of his element-by-element comparisons. *See* Appx29429-29446(PTX-1633); *e.g.*, Appx25048(370:10-18).

Once Ravgen produced evidence of written description support, the burden shifted back to Labcorp to present evidence that Claim 132 lacks description in the provisionals. *See Videotek*, 545 F.3d at 1328. But Labcorp had no ***admissible evidence*** in response, so it could not prove that Landes qualifies as prior art and that any combination proves invalidity by clear-and-convincing evidence. Moreover, Labcorp had nothing to say about Ravgen's evidence of earlier conception based on a July 31, 2001 lab notebook. Appx38102(PTX-0957) at Appx38240-38241. It could not have carried its burden of proof even if the reference (DTX-121) had been admitted.

Finally, the court did not compel Labcorp to drop all invalidity defenses, including § 112, mid-trial. *See* Appx25816-25817(1138:14-1139:2); Appx28074-

[10] Asserted Claim 132 narrows down to three chemicals that are "cell lysis inhibitor[s]," so there was no need to show that the provisionals supported Claim 55's "membrane stabilizer." And Van Ness showed the jury that sequencing a "locus of interest" was in the provisionals too. Appx29439-29440; Appx25050-25051(372:21-373:15) (showing this page).

28075. Labcorp's choice waived its invalidity defenses, and it was not improper for Ravgen to comment on that to the jury.

The district court did not abuse its discretion in denying a new trial.

## III. THIS COURT SHOULD NOT REMAND ON EQUITABLE ESTOPPEL.

The district court at the pretrial conference expressly permitted Labcorp to put on any evidence of correspondence and presuit interactions at trial, Appx23306(105:1-12), and did not set a separate bench trial date because Labcorp never filed any motion for bifurcation pursuant to Fed. R. Civ. P. 42(b), *see* Appx444-459. Thus, a single trial was set for all issues, where non-jury issues were to be taken up outside the jury's presence (e.g., at the end of the day or during deliberations), as is the standard practice. Labcorp made a strategic choice to present facts it believed helped on willfulness and waived its equitable estoppel defense. Days after trial was over, Labcorp attempted to resurrect its defense, which lacked merit anyway. This Court should affirm on waiver.

### A. The District Court Did Not Abuse Its Discretion in Finding Labcorp's Defense Waived.

Every day, trial courts handle concurrent trials involving jury and non-jury issues, where equitable issues are presented to the judge outside the jury's presence. The Western District of Texas follows this standard practice, Appx103, and Labcorp's counsel knew or should have known it from earlier trials. *E.g.*, *Freshub, Inc. v. Amazon.com, Inc.*, No. 6:21-cv-00511-ADA, D.I. 242 & 244 (W.D. Tex. June 22, 2021) ("Bench Trial completed" while jury

deliberated), *aff'd in relevant part*, 93 F.4th 1244, 1246, 1254 (Fed. Cir. 2024). And the district court is not alone; this practice is routine in patent litigation. *See, e.g.*:

- *eSpeed, Inc. v. Brokertec USA, L.L.C.*, 417 F.Supp.2d 580, 584 (D. Del. 2006) ("Concurrently with the jury trial, the parties tried the issues of inequitable conduct and laches to the court."), *aff'd*, 480 F.3d 1129, 1134-35 (Fed. Cir. 2007);

- *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356, 1358 (Fed. Cir. 2018) (appeal from N.D. Cal., which held"a concurrent bench trial" on unenforceability);

- *Graphon Corp. v. Classified Ventures, LLC*, No. 2:08-cv-00097-TJW, 2009 WL 900754, at *1 (E.D. Tex. Mar. 30, 2009) (declining to set a separate bench trial date because "[i]n patent cases, this court has ***routinely conducted bench trials*** on the issue of inequitable conduct ***during jury deliberations or after the verdict has been received***");

- *Vocalife LLC v. Amazon.com, Inc.*, 534 F.Supp.3d 698, 702 (E.D. Tex. 2021) (where inequitable conduct was asserted, "holding a bench trial on October 8, 2020 while the jury deliberated on their verdict");

- *Packet Intel. LLC v. NetScout Sys., Inc.*, No. 2:16-cv-00230-JRG, 2018 WL 4286193, at *1 (E.D. Tex. Sept. 7, 2018) ("***while the jury deliberated, a bench trial was conducted*** as to equitable issues");

- *Optis Wireless Tech., LLC v. Huawei Device USA, Inc.*, 421 F.Supp.3d 410, 412 (E.D. Tex. 2019) ("After jury deliberations began, the Court proceeded to take up the bench trial issues….").

Bifurcation to two separate trial dates is the exception, not the norm. *Graphon*, 2009 WL 900754, at *1. If Labcorp wanted a separate date for a bench trial, it needed to move for one. *See* Fed. R. Civ. P. 42(b). It never did.

Appx444-459. Labcorp buried in the 873-page joint pretrial submission: (1) ***a footnote*** about a motion *in limine*, Appx20787 n.6; and (2) a conditional request: "***to the extent necessary***, Labcorp requests a separate bench trial after the jury trial," Appx20802. Neither was a clear demand. And Labcorp did not ask for a separate bench trial date at the pretrial conference. Appx23305-23306.

So when trial began on September 19, 2022, and ended on September 23, 2022, that was Labcorp's opportunity to try all issues. Consistent with standard practice, it should have raised its equitable defense by presenting evidence. Yet Labcorp never mentioned equitable estoppel, during morning conferences or breaks, or at the end of the day or the close of evidence. *See* Statement of the Case, *supra* pp. 16-19. And Labcorp said there was nothing "to take up" when the court excused the jury following the verdict. Appx26072-26073.

Listing the defense in the pretrial order was not enough to ***prosecute*** the defense. *E.g.*, *Fractus, S.A. v. Samsung Elecs. Co.*, 876 F.Supp.2d 802, 838-39 (E.D. Tex. 2012). The district court justifiably expected Labcorp to present that defense, by evidence or argument, at ***some*** point during the trial. Appx100(9:15-19), Appx103(12:20-24). The court expected Labcorp's trial

counsel to understand courtroom procedure, as he surmised Ravgen's local counsel did. Appx96-97.

Whether by strategic choice, or lack of diligence, Labcorp waived its equitable estoppel defense. The district court did not abuse its discretion by finding waiver.

### B. Labcorp's Defense Was Not Meritorious.

Labcorp's defense was not meritorious because it merely rehashed the abrogated defense of laches. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 346 (2017). Labcorp's theory was that "Ravgen… engaged in futile licensing discussions… and fell silent for eight years." Br. 42.

Equitable estoppel requires more. Failed licensing talks are not "intentionally misleading silence" that can give rise to estoppel absent a preceding threat of "vigorous enforcement." *Meyers v. Asics Corp.*, 974 F.2d 1304, 1309 (Fed. Cir. 1992). Labcorp conceded there was no such threat. Appx24170.

Equitable estoppel also requires actual reliance, not merely change in position. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042-43 (Fed. Cir. 1992) (en banc). Labcorp's offer-of-proof includes no evidence

meeting that standard. *See* Appx28259-28266, Appx28271-28274; *Kaufman*, 34 F.4th at 1375.

Labcorp chose not to present its defense at trial because it lacked merit, and there is no reason for a futile remand.

## IV. THIS COURT SHOULD AFFIRM THE DAMAGES AWARD BASED ON RELIABLE EXPERT TESTIMONY AND FACTUAL EVIDENCE.

### A. The Jury Awarded Damages Based on Reliable Expert Testimony and a New Trial on Damages Is Not Warranted.

Substantial evidence supports the verdict, and Ravgen's damages testimony was based on reliable facts and analyses. On review of a district court's admission of expert testimony, this Court may consider the evidence at trial. *See VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330-31 (Fed. Cir. 2014).

The jury heard how the '277 Patent enabled Labcorp's billion-dollar prenatal tests, including Dr. Van Ness's unchallenged technical opinion that the '277 Patent is more valuable than the '540 patent and other patents in Labcorp's agreements. Appx25135-Appx25138(457:5-460:12). Labcorp itself used a $60 to $100 per-unit royalty structure when licensing out the Lo '540 patent for use in NIPTs. Appx25255-25259(577:7-581:14). Further, Ravgen used a consistent royalty structure—contained in the operative contractual terms of those licenses—with five licensees to the '277 Patent, that began at rate with 10% discounts as applicable. Appx25240-25246(562:15-568:20). When the discounted 30% rate is applied to Labcorp's $475 ASP for the infringing NIPTs, Ravgen's licenses support a per-unit royalty of up to

$142.50. Appx25247-25248(569:18-570:15). Ravgen's damages expert, Meyer, explained that he synthesized the Labcorp and Ravgen agreements into a $100-per-unit reasonable royalty, by adjustments that accounted for differences in the value of the licensed intellectual property. Appx25262-25265(584:10-587:22); Appx24149(demonstrative).

Meyer's analysis did not violate *EcoFactor* or *Exmark*. Labcorp's main allegation is that he improperly used royalty rates derived from the license agreements: Labcorp claims the Ravgen agreements were "lump sums," while the Sequenom agreements were for "a very different patent" for which Meyer failed to make "any adjustments." Br. 43. None of that is true. Labcorp also faults Meyer for not starting his analysis with the ***cost*** that Labcorp pays to buy the Streck tube. Br. 44. But there is no law requiring cost to serve as the royalty base or a cap on damages, especially considering that a Streck tube is not the smallest salable patent-practicing unit (SSPPU).

### 1. The District Court Did Not Abuse Its Discretion by Admitting Meyer's Testimony About the Ravgen Agreements.

Meyer's use of the Ravgen agreements was reliable because he "demonstrated, at a minimum, the required 'baseline comparability.'" Appx72-73 (quoting *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353,

1374 (Fed. Cir. 2020)). Even after *EcoFactor*, an "important factor" is the "royalties received by the patentee" to license the patent-in-suit itself "because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1340-41 (Fed. Cir. 2025) (en banc). Here, each of the Ravgen agreements licensed just two patents: the '277 Patent and the '720 Patent, which Labcorp argued below cover the "same subject matter." Appx6330. And their royalty rates reflect a market-tested value of Dr. Dhallan's invention to a diagnostic test that sequences cfDNA and collects samples in Streck tubes. Appx25248-25249(570:17-571:7); Appx25930(1252:5-13) (Labcorp's expert). Meyer testified specifically to how and why those agreements were technologically and economically comparable. Appx25238-25239(560:11-561:16); Appx25261-25265(583:20-587:2); Appx10293-10315.

None of Labcorp's attacks on the Ravgen agreements demonstrate an abuse of discretion. *First*, Labcorp claims each license agreement was a "litigation-driven settlement." Br. 46. That is wrong on the record. Only the PerkinElmer license was reached as a settlement following litigation; the rest are straightforward patent licenses where there was no litigation between the parties. Appx10306(¶113); Appx10129; Appx10142; Appx10432; Appx10452;

Appx10848. Moreover, there is nothing unusual about what Labcorp labels "threatened litigation" (Br. 48-49)—***every license*** is negotiated against the threat of litigation, as a license "is in substance nothing but a covenant not to sue." *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1370 (Fed. Cir. 2017). The non-PerkinElmer licenses are sufficient standing alone, as they all used the same royalty structure, discussed below. But even the PerkinElmer license, which had a rate final rate, was sufficiently comparable because it reaffirmed that the same structure was used. Appx10306-10307(¶¶115-118). "[P]rior settlements can be relevant to determining damages" without "requir[ing an] identity of circumstances," so long as the differences are accounted for. *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1299 (Fed. Cir. 2019) (citation omitted).

*Second*, Labcorp ignores a significant difference between the licenses in *EcoFactor* and those here. In *EcoFactor*, the expert relied on the agreements' preliminary recital where one party "believes" the payment reflected a royalty rate, but the "plain language" of the agreed contract terms "***expressly disavow***" any royalty rate. 137 F.4th at 1342-43. For example, those agreements stated: "such a lump-sum amount is ***not*** based upon sales and does not reflect or constitute a royalty" and "nothing in this clause should be

interpreted as agreement by Schneider that $[X] per unit is a reasonable royalty." *Id.* Moreover, that expert relied on no other data for his rate, such as market share or sales figures. *Id.* at 1344-45.

Here, far from disclaiming a royalty rate, the parties negotiated the rates and then incorporated the royalty structure into the agreements' terms. For example, the Clinical Genomics license states that "Payment for Past Infringement" was "calculated as follows" with a "Royalty Base" and a "Royalty Rate" of [redacted] minus discounts:

> **3. PAYMENT**
>
> **3.1** As consideration for the release set forth Section 2.2, Clinical Genomics shall pay to Ravgen, within fifteen days of the Effective Date, the sum of US [redacted] (United States Dollars), calculated as follows:
>
> Royalty Base: Total Revenue of Covered Products for Calendar Years 2017, 2018, 2019, and 2020, and January 1, 2021 through March 31, 2021: [redacted] divided by 2 to account for non-accused blood collection tubes = [redacted]

| | |
|---|---|
| Royalty Rate | [redacted] |
| First Mover Discount | – 10% |
| Litigation Avoidance Discount | – 10% |
| Resulting Royalty Rate | [redacted] |

> Payment for Past Infringement (Royalty Base x Resulting Royalty Rate): [redacted]

Appx10133; Appx10133-10134 (forward-looking license calculated same way); Appx10456 (PGDx agreement with same structure and "research-use only" noncommercial discount). Similarly, PerkinElmer warranted its US revenue for cfDNA kits, Appx10441, and Labcorp's expert admitted that PerkinElmer paid "[redacted] percent of the sales price" as a royalty. Appx25936-25937(1258:10-

(1) starting royalty rate
(2) calculated royalty
(3) revenue amount
(4) revenue amount divided by 2
(5) resulting royalty rate
(6) PerkinElmer net royalty rate

1259:2). The royalties paid by Thermo Fisher for its license, Appx10853, were similarly calculated by applying a rate rate, minus discounts, to a royalty base. Appx24601 ("Thermo Fisher Royalty Analysis" spreadsheet); Appx10295-10297. Those rates were corroborated by Dr. Dhallan's testimony. Appx24842-24846(164:24-168:4). Meyer, who reviewed the agreements and the associated worksheets, testified that each agreement's sum was "based on the rate and the level of sales" of each licensee. Appx25240-25244(562:15-566:20); Appx24132-24134(demonstrative). And when he applied the royalty structure to Labcorp, he credited Labcorp the same 10% first-mover discount given to other licensees, because it would have been applicable to Labcorp at the hypothetical negotiation. Appx24135(demonstrative).

Unlike *EcoFactor*, the agreements ***complement***, rather than contradict, the testimony.

*Third*, Labcorp argues that Meyer's entire analysis is fatally infected by a single most-favored-nation clause (MFN) in the fifth Ravgen license with Inivata, but Meyer did not rely on the Inivata license in his reasonable royalty analysis. Br. 49-50 (citing *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358 (Fed. Cir. 2021)). Meyer told the jury why he chose ***not*** to rely on the Inivata agreement: unlike the others, he had "less information" regarding

the sales and how it was negotiated. Appx25244-25245(566:21-567:7). Unlike *MLC*, where an "inference" from the MFN was ***the sole basis*** to derive a rate, 10 F.4th at 1368, Meyer relied on the royalty structures from the other agreements, sales data, and testimony; the MFN was only an extra datapoint for confirmation. *See* Appx10294-10300; Appx10305-10314.

*Fourth*, the Ravgen agreements licensed just ***two*** closely related licensed patents—the '277 Patent and the '720 Patent—and Ravgen's experts properly accounted for that in their analyses. *E.g.*, Appx10849(§ 1.6) ("'Ravgen Licensed Patents' means" the '277 and '720 Patents). Both patents involve the use of an agent that inhibits cell lysis in cfDNA sequencing, and a terminal disclaimer of the '720 Patent over the '277 Patent to obviate double-patenting (Appx1182) shows just how closely related they are. *See Lab. Corp. of Am. Holdings v. Ravgen, Inc.*, No. 23-1517, 2025 WL 324749, at *1 (Fed. Cir. Jan. 29, 2025) (companion case regarding '720 IPR, describing the two patents as "related" with "similar claims"). Indeed, Ravgen had asserted both patents in this case against the same accused NIPTs. Appx480-481(¶¶28-35); Appx23341-23342. When Sequenom expressed interest in 2012, it identified both the '277 Patent and the '720 Patent together, Appx37095, and proposed a structure where Ravgen would license "***its two patents***," Appx38335(PTX-

1301). And Labcorp even argued below that the '720 Patent is "directed to the ***same technology*** and the same subject matter" as the '277 Patent. Appx6321.

Contrary to Labcorp's incorrect claim that Meyer failed to account for the fact that the Ravgen agreements licensed "all Ravgen-owned patents," Br. 50-51, Meyer ***did*** explain that to the jury. Appx25246-25247(568:21-569:17); *see also* Appx10849(§ 1.6). The jury learned that both patents are "highly related" with "overlapping claims" concerning the "recovery of the cell-free DNA," as shown above. Appx25307-25308(629:12-630:9); Appx25222-25225(544:18-547:18); Appx25246-25247(568:21-569:17). Meyer based his analysis on the (unchallenged) technical analysis of Dr. Van Ness. Appx25222-25223(544:18-545:22); Appx9673-9678. Based on that reliable foundation, Meyer concluded that his royalty opinion would not change whether it was one or both patents. Appx14761 n.597; Appx25246-25247(568:21-569:17) (testifying that Ravgen's other licensing negotiations gave no "additional discount" if a licensee used one or the other or both patents).

*Bio-Rad* supports that analysis. There, the jury awarded the patentee's full requested damages, and that award remained undisturbed on appeal—even after infringement of two of the three patents-in-suit was vacated, because all three patents had overlapping claims, the remaining infringed

patent covered all products, and "the damages award is not predicated on infringement of any one patent." *Bio-Rad*, 967 F.3d at 1360-61, 1372. Similarly, in *Hologic*, the damages award was upheld after one of the two asserted patents was invalidated post-verdict, because the expert testified that his royalty rate applied to both patents "individually or the two patents collectively" as "both [patents] cover the entire procedure and device respectively." *Hologic, Inc. v. Minerva Surgical, Inc.*, 957 F.3d 1256, 1271 (Fed. Cir. 2020), *vacated on other grounds*, 594 U.S. 559 (2021), *reinstated*, 44 F.4th 1358 (Fed. Cir. 2022).

Labcorp's assertion that *Omega* and *ResQNet.com* render this approach "impermissible" is incorrect. Br. 50-51 (citing *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1381 (Fed. Cir. 2021) and *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010)). There, the experts had presented "licenses with ***no relationship*** to the claimed invention," *ResQNet.com*, 594 F.3d at 873, and licenses with a "long list of patents," *Omega*, 13 F.4th at 1381, and in neither case did the expert explain the differences. Here, Meyer explained why Ravgen's licenses for the '277 and '720 Patents did not require additional adjustments because the real-world negotiations treated those patents as having overlapping value. Appx25246-25247(568:21-569:17).

Because Meyer showed the required "baseline comparability" and assessed any differences between the Ravgen agreements and the hypothetical negotiations, Appx25246-25247(568:21-569:17); Appx25307-25308(629:18-630:9), the district court was correct to admit his testimony and to treat the "degree of comparability [as] a factual issue best addressed through cross examination." *Bio-Rad*, 967 F.3d at 1374. Labcorp extensively cross-examined Meyer on those agreements, Appx25282-25293(604:7-615:16), and presented rebuttal from Prowse, who focused entirely on attacking comparability, Appx25892-25894(1214:14-1216:21). *See VirnetX*, 767 F.3d at 1330 ("[The] differences that Apple complains of were presented to the jury, allowing the jury to fully evaluate the relevance of the licenses….").

**2. The District Court Did Not Abuse Its Discretion by Admitting Meyer's Testimony About the Sequenom Agreements.**

Labcorp's attack that Meyer failed to account for any differences between the three Sequenom licenses and the hypothetical negotiation is based on a myopic view of the record. Br. 51-55. Labcorp improperly ignores Meyer's analysis and the underlying unchallenged technical testimony from Dr. Van Ness, which, together, reliably addressed comparability.

Before Meyer testified, the jury had already learned that Quest agreed to pay Sequenom $60/test for a license to the Lo ’540 patent—and that rate was just for patent rights. Appx25199-25200(521:15-522:12), Appx25202(524:7-22), Appx25203(525:5-17).

Meyer began with a technical comparability analysis, relying on Dr. Van Ness’s technical analysis. Appx10322-10323; Appx10390-Appx10391; Appx9901-9914; Appx25251-25252(573:2-574:11); Appx25257-25259(579:2-581:12). Dr. Van Ness testified that the Lo ’540 patent was technically comparable to the ’277 Patent because both “were detecting fetal DNA in maternal plasma”—but the ’540 patent did not enable a commercial, broadly applicable NIPT because it only works for “male babies.” Appx25134-25138(456:1-460:12); Appx25278-25279(600:22-601:20); Appx24139(demonstrative); *supra* pp. 13-14. Therefore, the ’277 Patent is more valuable than the ’540 patent. *Id.* Similarly, for Sequenom-Quest and Sequenom-Mayo, Dr. Van Ness performed patent-by-patent technical comparisons for all issued U.S. patents (even later-issued ones), against the ’277 Patent. Appx25257-25259(579:2-581:12); Appx24145(demonstrative); Appx.25135-25138(457:5-460:12). Dr. Van Ness concluded that the ’277 Patent was more valuable than the Sequenom-licensed patents because it enabled

broader availability of NIPTs. Appx25135-25138(457:5-460:12); Appx24146(demonstrative). Accordingly, Meyer concluded that the Sequenom licenses have "comparable patented technology" but required upward adjustment because the "'277 patent was more valuable technically." Appx25251-25252(573:2-574:11); Appx10315-10324; Appx24138-24139(demonstrative); Appx25135-25138(457:18-459:20); Appx25260-25261(582:14-583:2); Appx24121-24123(demonstrative); Appx24146(demonstrative).

Meyer next analyzed economic comparability. For the ISIS-Sequenom agreement, Meyer acknowledged that Labcorp is the licensee, and the agreement used a running royalty structure. Appx25252(574:10-576:5); Appx10317-10324; Appx24140-24141(demonstrative). For the Sequenom-Mayo and Sequenom-Quest agreements, Meyer considered testimony from Labcorp's licensing witness about the per-unit royalty structure. Appx25202-25203(524:18-525:1); Appx25247-25248(569:18-570:1510). Both agreements relate to "cell-free DNA testing," include "U.S. product sales," contain "nonexclusive rights," and use a "running royalty structure on a per-unit basis." Appx24147(demonstrative); Appx25200-25203(522:7-525:2); Appx25261(583:3-17).

Finally, Meyer accounted for differences with the hypothetical negotiation with Ravgen. He adjusted the Sequenom agreements upward because of the valid and infringed assumption, lack of relationship, and the differing value of the licensed technology compared to the '277 Patent; he adjusted some agreements downward because Labcorp's sales volume and infrastructure would have given it bargaining power against Ravgen, and the ISIS-Sequenom and Sequenom-Mayo agreements included know-how. *See* Appx25261-25263(583:20-587:22); Appx24149(demonstrative); Appx10404-10407(¶¶374-389).

Labcorp takes specific issue with the Sequenom-Mayo and Sequenom-Quest agreements because they also included foreign patent rights and other patent applications that never issued. Br. 52-54. But Meyer accounted for those assets. For example, he limited his comparison to issued U.S. patents because the hypothetical negotiation is for a license to practice in the United States. Appx25257-25260(579:2-582:11). A Sequenom licensee selling products domestically would pay the stated ***per-unit rate*** for the right to practice the U.S.-issued patent—the foreign patents or never-issued applications do not have an actual right-to-exclude that matters to the domestic product. Appx25257-25259(579:2-581:18).

The district court did not abuse its discretion by allowing Meyer's testimony related to the Sequenom agreements. *See Elbit*, 927 F.3d at 1301.

### 3. Meyer Apportioned to the Claimed Invention.

Aside from its attacks on the licenses, Labcorp claims Meyer's opinion should have been excluded for failure to apportion. Labcorp's argument, including its attacks on "built-in apportionment," disregards Meyer's analysis and misunderstands caselaw.

*First*, Meyer's analysis properly relied on built-in apportionment in the Ravgen and Sequenom agreements to set a range of royalties, to which adjustments for the hypothetical negotiation were applied. Appx24149(demonstrative). All seven agreements applied a royalty rate to licensed cfDNA products, and thus, that rate already accounted for the market value of the patented technology. Appx24136(demonstrative), 24141(demonstrative), 24147(demonstrative); Appx25248-25249(570:17-571:7), Appx25253(575:2-18), Appx25261(583:5-17). This Court has repeatedly endorsed built-in apportionment in the hypothetical negotiation because it "assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination ***embodying the value of the asserted patent***." *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1041 (Fed. Cir. 2020);

*see Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1380 (Fed. Cir. 2022) (affirming damages award where a settlement agreement "provided sufficient evidence of 'already built-in apportionment.'") (quoting *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015)). Thus, "a party relying on a sufficiently comparable license ***can adopt the comparable license's royalty rate and royalty base without further apportionment*** and without proving that the infringing feature was responsible for the entire market value of the accused product." *Vectura*, 981 F.3d at 1041.

As reviewed above, Meyer did not mechanically apply the rates from those agreements to Labcorp's sales. Instead, Meyer synthesized those rates in his analysis and provided upward and downward adjustments based on the impact of other *Georgia-Pacific* factors. *See* Appx25261-25265(583:20-587:22); Appx24149(demonstrative). For example, Meyer accounted for the value of different patents in the Sequenom agreements, Labcorp's bargaining position, and Labcorp's existing infrastructure, among other factors, before concluding the reasonable royalty was $100/test. *See* Appx25261-25265(583:20-587:22); Appx24149(demonstrative). Those downward adjustments are why Meyer did not simply adopt the highest-supported rate from the Ravgen agreements of

$142.50 (30%), but instead arrived at a $100 rate (21% of Labcorp's $475 ASP). Appx25262-25265(584:10-587:22).

*Second*, Labcorp's suggestion that Meyer's analysis was faulty because he needed to apportion to the ***cost*** that Labcorp pays Streck for a tube is unsupported by law and the record. Labcorp criticizes Meyer for using the selling price of the NIPT as the royalty base instead of the cost of a Streck tube. *See* Br. 44 (citing *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1348 (Fed. Cir. 2018)). But *Exmark* explicitly rejects such a rigid approach that requires apportioning the royalty base, instead permitting apportionment in the rate, or a combination of both. *See Exmark*, 879 F.3d at 1348. And this Court already rejected in *Pavo Solutions* the notion that a defendant's costs necessarily relate to the value of the invention, which is the proper test for damages. 35 F.4th at 1379 ("[T]he costs to [Defendant] for the materials are not the same as the value of the patented feature….").

Moreover, Meyer and Dr. Van Ness both testified that the invention's value comes from the claimed combination of steps and is not limited to the tube or the chemical itself. Appx25131-25133(453:25-455:20); Appx25302-25304(624:14-626:3); *see AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1339 (Fed. Cir. 2015). They further testified that the invention was "foundational

to genetic testing" in part because it allowed shipping of samples and central processing, and if no preservation was done to get the fetal cfDNA in the first place, there would be nothing to sequence. Appx25133(455:13-20); Appx25223-25226(545:25-548:21); Appx25228-25231(550:1-553:12). Furthermore, every real-world agreement from both sides used the test as the royalty base. *See* Appx24136(demonstrative); Appx24141(demonstrative); Appx24147(demonstrative).

Thus, Meyer adequately apportioned, consistent with the law and the record.

### B. The Court Did Not Abuse Its Discretion by Excluding Prowse's Improper Analysis that Treated the Streck Tube—Which Cannot Be "Patent-Practicing"—as the SSPPU.

*First*, the district court correctly excluded Prowse's selection of Streck tubes as the royalty base because Streck tubes "cannot practice the patented inventions" and no technical expert opined that the Streck tube itself practices Claim 132. Appx56-61. Asserted Claim 132 is directed to the preparation and analysis of DNA from a collected sample and requires sequencing the fetal DNA, which ***Labcorp*** performs, not Streck. Appx25442-25447(764:3-769:9); Appx25854-25858(1176:2-1180:23). Thus, the full NIPT was an appropriate royalty base. Appx56-59; *see Exmark*, 879 F.3d at 1348. Moreover, Prowse's

use of the cost of the tube as the base did not "reliably capture[] the value of [the] benefits" provided to Labcorp by the '277 Patent. Appx56-61; *Pavo Sols.*, 35 F.4th at 1379-80.

*Second*, despite the exclusion of Prowse's damages theory based on $5/tube, Labcorp was still permitted to present that theory to the jury repeatedly. *E.g.*, Appx25894-25897(1216:22-1219:12); Appx25924-25927(1246:6-1249:7). Labcorp cross-examined Meyer regarding the cost of Streck tubes, and compared the cost of Streck tubes to Meyer's per-unit royalty rate, noting that Meyer's ask was "20 times more than what Labcorp pays Streck." Appx25276-25280(598:3-602:20). And Labcorp's counsel used a fact witness as a proxy to testify about the excluded royalty base—including the total number of tubes purchased, the total price paid, and "a little math" to get to the $5 to $7.63 per tube. Appx25501-25503(823:15-825:24). The jury still heard Labcorp's theory, so there was no prejudice—let alone enough to warrant a new trial. *See Medtronic Inc. v. Intermedics, Inc.*, 799 F.2d 734, 741 (Fed. Cir. 1986).

* * *

Labcorp has not shown any abuse of discretion in the district court's *Daubert* rulings nor a lack of substantial evidence. The district court did not

abuse its discretion by denying a new trial on damages. Therefore, this Court should affirm.

## V. THE WELL-SUPPORTED WILLFULNESS VERDICT AND ENHANCEMENT ORDER SHOULD STAND.

### A. The District Court Correctly Denied JMOL of No Willful Infringement.

#### 1. Substantial Evidence Supports the Verdict.

"'[W]illfulness' requires a jury to find no more than deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021); *Halo*, 579 U.S. at 104-06. Labcorp does not dispute knowledge of the patent, and Ravgen presented ample evidence to show that Labcorp's infringement was deliberate and intentional. *See supra* pp. 8-13, 16. Labcorp pays lip service to the JMOL standard, Br. 22, but its argument at pp. 57-61 entirely rests on (1) testimony of Labcorp witnesses the jury was not required to accept, (2) distinctions irrelevant to infringement, for the reasons addressed above in Section I, and (3) a prayer for this Court to draw *different* inferences than the jury permissibly drew from the evidence, which this Court cannot do on substantial evidence review. *Wi-LAN*, 811 F.3d at 461.

This was not a case of accidental infringement. For example, the jury heard that Labcorp tried to get exclusive rights to Ravgen's '277 Patent right as it was entering the NIPT market. Appx38323-38324; Appx38331; Appx38335; Appx37095; Appx24829-24829(151:1-154:5). Sequenom did not just ask for a license; Hixson proposed paying a "royalty" to Ravgen "***for the***

***use* of the Ravgen IP**," eight days after Sequenom scientists reported that Streck tubes "prevent[] lysis" "through cross-linking." Appx38335(PTX-1301); Appx37310, Appx37333. Labcorp knew that the use of Streck tubes involves formaldehyde and cross-linking as the mechanism of inhibiting cell lysis. Appx37328; Appx25555(877:6-15); Appx37188. And the jury heard how Labcorp employees reacted when Ravgen sued Natera, showing that they were expecting Ravgen to assert its patent. Appx38325; Appx38327.

Labcorp tries to draw different inferences from Dr. Scholl's statement "that Ariosa would be infringing [Ravgen's] patents," claiming that had "nothing to do with either the '277 patent or Labcorp's NIPTs." Br. 60; Appx24824(146:2-6). But Ariosa's test, which was on the market before Labcorp's own informaSeq NIPT, used Streck tubes. Appx25010(332:22-25). Because Labcorp knew that distributing Ariosa's test "would be infringing," Appx24823-24824(145:24-146:6), the jury was permitted to infer that Labcorp knew its own NIPT would infringe in the same way.

The jury was allowed to weigh Ravgen's evidence against Labcorp's purported "good-faith evidence" that it "took a different path" (Br. 59), but this Court may not. *Gomez*, 442 F.3d at 937-38; *Wi-LAN*, 811 F.3d at 461. The

district court correctly denied JMOL. *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245 (Fed. Cir. 2017).

### 2. Ravgen Did Not Violate Section 298.

Labcorp argues that Ravgen violated the "second clause" of § 298, Br. 62, an evidentiary rule that bars patentees from using "the failure of the infringer to present such advice [of counsel] to the court or jury" to prove willful infringement. 35 U.S.C. § 298. Ravgen did not make its case out of shaming Labcorp for refusing to disclose whatever advice-of-counsel it got, but rather from a body of substantial evidence demonstrating knowledge of infringement that independently supports the willfulness verdict. *Supra* pp. 8-13, 72-73. Labcorp has not even alleged that the evidence discussed above in Section V.A.1 runs afoul of § 298, so it cannot show prejudicial error warranting a new trial on willfulness. *See Williams*, 898 F.3d at 615. That is all this Court needs to affirm on willfulness.

In any event, Ravgen did not violate § 298. *First*, though Ravgen did call out Labcorp for not calling Dr. Scholl to testify at trial (Br. 64), that is not prohibited. As Labcorp's cited case makes clear, § 298 implicates only privileged ***legal advice***. *See Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 956 (Fed. Cir. 2024). Tom Scholl is a nonlawyer who read Dr. Dhallan's

patents himself, formed his own opinion about the breadth of the claims, and told others. *See* Appx38323-38324; Appx38100. Drawing attention to his absence was fair game.

Labcorp's complaint about Ravgen's use of a 2011 email from Dr. Scholl, Appx38331(PTX-1271)—an exhibit admitted without objection, Appx24818(140:1-13)—recharacterizes what happened. Br. 63. That email was a *disclosure* from a Labcorp employee *to Dr. Dhallan* that Labcorp had consulted attorneys and was now reaching out to Ravgen afterwards. Appx38331. Thus, Dr. Dhallan was testifying about Labcorp's apparent ***business decision*** to negotiate ***after*** Labcorp attorneys reviewed the patent, not that the jury should draw an adverse inference from refusing to waive privilege. Appx24820(141:11-18). Ravgen's cross examinations of Drs. Eisenberg and Meltzer regarding this email similarly focused on Labcorp's business decision to continue negotiations. *See* Appx25610-25611(932:21-933:5); Appx25878-25880(1200:20-1202:2).

*Second*, Labcorp gripes about another email chain used during cross-examination merely because it ***mentions*** an attorney named Charles. Br. 63; Appx38323(PTX-1231). But Ravgen did not ask about Charles or legal advice he provided. Appx25599-25605(921:2-928:8). The district court guarded

against such questioning, and its admission of PTX-1231 was not an abuse of discretion. *See* Appx25598-25599(920:1-921:5).

*Third*, Labcorp edits quotations from Ravgen's cross-examination of Deborah Boles, purportedly about "IP analysis 'in writing.'" Br. 63. But Ravgen's question about whether "you put ***it*** in writing" came right after testimony about Labcorp's "standard practice" of a written confidentiality agreement (CDA). Appx25416-25417(738:14-739:11). The question did not call for privileged analyses of patents. The district court recognized the same when it denied JMOL. Appx140.[11] Section 298 has no bearing on that testimony.

Congress used specific words to limit § 298 to what it actually says—that patentees cannot use a failure to present "advice of ***counsel***" to show willfulness. H.R. Rep. No. 112-98, at 53 ("Section 298… is designed to protect attorney-client privilege…."). None of Ravgen's conduct falls within § 298's ambit.

---

[11] Appellate courts should "[d]efer[] to the trial judge, who has had an opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record." *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982).

*Finally*, Labcorp ignores that § 298 is merely an "evidentiary rule," *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 780 F.3d 1357, 1359 (Fed. Cir. 2015) (Taranto, J., concurring), which means that Labcorp was obligated to contemporaneously object. Labcorp complains about closing arguments, but Labcorp did not object when Ravgen called out Dr. Scholl's absence and his knowledge based on PTX-1271 (Appx38331)—an exhibit similarly admitted without objection. *See* Appx24818(140:10-13:4); Appx26068(1390:5-9). Labcorp cites no authority requiring that § 298 be given as a jury instruction and does not argue that the district court gave incorrect jury instructions on willfulness generally (Appx26002-26003; Appx23370). Because § 298 was not violated, the district court did not err by rejecting Labcorp's request.

#### 3. The District Court Did Not Abuse Its Discretion on Evidentiary Rulings of Hearsay.

The district court properly sustained Ravgen's hearsay and foundation objections, thereby excluding two exhibits (DTX-0903 and DTX-0904) that Labcorp purported to be testing of "the Ravgen method." Br. 65; Appx25629-25639(951:14-961:10).

Dr. Watson only knew about the testing results because she "discussed them with the lead scientist…responsible for performing these tests," and "was in a meeting" where others met about the results. Appx25634-

25636(956:23-958:10). She gave similar testimony on *voir dire* demonstrating lack of direct personal knowledge of DTX-0903 and DTX-0904. Appx25631-25632(953:19-954:11); Appx25638-25639(960:7-961:5).

Labcorp now argues it was not offering the testing evidence for the truth of the matter asserted, but it ***never argued that to the district court***. *See* Appx27421. Instead, it characterized that evidence as "scientific testing showing Ravgen's method didn't work," i.e., for the truth of the matter. Appx27421. After the Court gave Labcorp multiple attempts to lay a foundation, Labcorp withdrew its proffer of DTX-0904. Appx25639(961:7-9).

Finally, the district court did allow Labcorp to present more about the testing evidence on redirect. Labcorp was allowed to elicit testimony about the testing and even publish DTX-0904 to the jury. Appx25672-25675(994:2-997:16); Appx25628(950:11-24); Appx25641-25643(963:2-965:16). Labcorp cannot claim any prejudice—much less prejudice warranting a new trial—arose from the Court's hearsay rulings when the jury saw and heard the testing evidence anyway.

### B. The Court Properly Exercised Discretion in Enhancing Ravgen's Damages by 37% Based on Facts Found by the Jury and the *Read* Factors.

The district court opinion included not only an analysis of the *Read* factors, but also a lengthy exposition of the trial evidence that demonstrated knowing and intentional infringement. Appx107-110. That factual background, consisting of the overwhelming evidence on which the jury found willfulness, itself demonstrates culpable, punishable behavior.

Labcorp's suggestion that the court was obligated to find "malice or piracy" before enhancing Ravgen's damages, Br. 67, is inconsistent with the flexibility that *Halo* called for. 579 U.S. at 106; *id.* ("Section 284 allows district courts to punish the ***full range*** of culpable behavior."). And Labcorp cites no authority for its suggestion that the *Read* framework—or any individual *Read* factor—is less relevant after *Halo*.

Indeed, in *SRI v. Cisco*, 14 F.4th 1323, this Court confirmed that the *Read* factors remain an appropriate framework. This Court affirmed enhancement of double damages despite no allegations of copying and based only on "Cisco's litigation conduct, its status as the world's largest networking company, its apparent disdain for SRI and its business model, and the fact that Cisco lost on all issues during summary judgment and trial, despite its

formidable efforts to the contrary." *Id.* at 1330-31. The district court here had even stronger justification to enhance damages, determining that five of nine *Read* factors, including Labcorp's duration of misconduct and lack of remedial action, weigh in favor of enhancement. Appx117. And "there is some evidence of possible concealment by Labcorp," Appx112, because Labcorp changed its documentation one week after it learned of Ravgen's case against Natera to remove a key fact about how Streck tubes inhibit cell lysis, Appx116.

Finally, the district court's enhancement was more conservative—a 37% enhancement of Ravgen's damages award versus 100% in *SRI*.

Accordingly, there was no abuse of discretion.

## **CONCLUSION**

For the foregoing reasons, Ravgen respectfully requests that this Court affirm.

October 31, 2025

Respectfully submitted,

/s/ *Kerri-Ann Limbeek*

John M. Desmarais
Kerri-Ann Limbeek
Brian D. Matty
Frederick J. Ding
Raymond Habbaz
Gillian Moore
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400
Fax: (212) 351-3401
jdesmarais@desmaraisllp.com
klimbeek@desmaraisllp.com
bmatty@desmaraisllp.com
fding@desmaraisllp.com
rhabbaz@desmaraisllp.com
gmoore@desmaraisllp.com

*Counsel for Appellee Ravgen, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 25-1570

**Short Case Caption:** Ravgen, Inc. v. Laboratory Corporation of America Holdings

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,951 words.
- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 10/31/2025

Signature: /s/ Kerri-Ann Limbeek

Name: Kerri-Ann Limbeek

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 25-1570

**Short Case Caption:** Ravgen, Inc. v. Laboratory Corporation of America Holdings

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 11 number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 10/31/2025

Signature: /s/ Kerri-Ann Limbeek

Name: Kerri-Ann Limbeek

## CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing brief to be served on October 31, 2025, by email on the following counsel of record for Labcorp:

Gregory A. Castanias
gcastanias@jonesday.com
Tracy Stitt
tastitt@jonesday.com
Amelia DeGory
adegory@jonesday.com
Brendan D. Duffy
bduffy@jonesday.com
John R. Boulé III
jboule@jonesday.com

Dated: October 31, 2025

/s/ *Kerri-Ann Limbeek*
Kerri-Ann Limbeek